Filed 4/13/21  In re Ariana B. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re ARIANA B. et al., Persons Coming Under the Juvenile Court Law. | B307774 (Los Angeles County Super. Ct. No. 20CCJP01560) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>ADRIAN B.,<br><br>      Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Rashida A. Adams, Judge. Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Adrian B. (father) was arrested on March 8, 2020 after a two-month investigation by the Los Angeles Sheriff's Department (LASD) revealed he was selling drugs, both out of his home and at a local bar. When they arrested father, deputies found drugs and a large sum of money on him and found more drugs, paraphernalia to package the drugs for sale, and a loaded firearm in the garage adjoining (but not accessible from inside) the family's home. Because four minor children lived in the home, deputies referred the family to the Los Angeles Department of Children and Family Services (DCFS), which eventually filed a petition in the juvenile court alleging that father's drug business placed the children at a substantial risk of serious physical harm and that the children's mother, Daniela C., had failed to protect them.

At a hearing on September 8, 2020, the juvenile court concluded based on father's drug business that the children[1] were persons described by Welfare and Institutions Code section 300,

_____

[1] As explained below, the two youngest children were father's. The two oldest children were mother's by another father, who did not participate in these proceedings at any stage.

2

subdivision (b).[2]  Father filed a notice of appeal (mother did not), and argues here that the evidence is insufficient to support the juvenile court's jurisdiction and disposition orders.  Father argues that the evidence below demonstrates no risk of harm to the children from his actions, either in the past or existing at the time of the jurisdiction and disposition hearing.  He further argues that DCFS demonstrated no nexus between his actions and any risk of harm to the children.

We disagree with father's arguments and will affirm the juvenile court's orders.

## BACKGROUND

On March 8, 2020, LASD deputies arrested father and served warrants to search him, his vehicle, and his residence. LASD surveillance revealed that since January 2020 father had been selling drugs out of the home he shared with mother, the couple's two children, Ariana B. (then three years old) and Adrian B., Jr. (then 20 months old), and mother's two other children from another father, Izabelle R. (then 11 years old) and Lilianna R. (then seven years old).[3]

LASD deputies arrested and searched father at the Tropic Lounge in Hawaiian Gardens.  According to their report, deputies "recovered a plastic bag containing cocaine from [father's] pants

---

[2] Statutory references are to the Welfare and Institutions Code unless otherwise noted.

[3] Izabelle and Lilianna's father is Jorge R.  Mother has full legal and physical custody of Izabelle and Lilianna.  Jorge R. is allowed no contact with mother, Izabelle, or Lilianna under the terms of a restraining order issued to mother.  Jorge R. has never been a party to these proceedings.

3

pocket." Deputies then went to the family home. There they asked father what narcotics he had in the home; father replied, "I have coke and meth." Asked where the drugs were, father replied, "All the dope I have is in a tan backpack on the shelf in the laundry room."

The home's garage and laundry room were not accessible from inside the home, but rather were accessible by a large garage door and a smaller metal security screen door outside the home, both of which required a key to enter. Father had the only key, which deputies used to access the garage. Deputies retrieved the backpack from the laundry room and found in the bag three-quarters of a pound of methamphetamine, half an ounce of cocaine, several pills believed to contain fentanyl, a digital scale, empty plastic baggies commonly used to package narcotics, and a loaded (with nine live rounds) Smith & Wesson 9mm handgun with an obliterated serial number. During the booking process, deputies found $836.00 in father's wallet.

Father was charged with four felony counts: possession of a controlled substance for sale (Health & Saf. Code, § 11378); possession of a designated controlled substance for sale (Health & Saf. Code, § 11351); possession of a controlled substance while armed (Health & Saf. Code, § 11370.1, subd. (a)); and possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1)).

Deputies contacted DCFS. DCFS initiated an investigation the same evening father was arrested.

DCFS interviewed mother, Lilianna, and Izabelle at the family home on the evening of March 8, 2020. Mother told DCFS that she was not aware of drugs or firearms in the family home. She denied using drugs or alcohol, and told DCFS that she was willing to drug test. The older two children, Lilianna and

4

Izabelle, reported that they were allowed to go inside the garage and were never told to stay out of the garage. Lilianna told DCFS that the children's scooters were stored in the garage, and that they regularly went into the garage to retrieve them. The two younger children (Ariana and Adrian) could not give meaningful statements to DCFS.

On March 12, 2020, four days after father was arrested, DCFS met with father at the facility where he was being held. According to DCFS's report of the interview, "father denied that there were any drugs or weapons in his home. The father stated that the drugs and weapon [found in the home] did not belong to him. The father stated that the garage is not connected to [the] home and others have access to [the] garage." Asked "if the garage was locked," father replied, "yes but people can break into the garage."

At a later interview, mother told DCFS that she was not aware that either the drugs or the gun that deputies found were in the home. Mother said that she had never seen the backpack deputies found in the home's laundry room. Mother told DCFS that she was not aware whether father had been involved in drug sales. But since moving into the home in January 2020, mother said she "saw people going in and out of the garage," and that father "had people over on the weekends." Mother explained that father had set up the garage as a "man cave" where father and his friends "hung out . . . and sometimes they would drink." Mother explained that she did not associate with father and his friends while they were on the property, but rather she "would stay inside with the kids." Mother was aware that father had been involved in a gang, but father told her "he was not involved in that life anymore."

5

On March 20, 2020, DCFS filed a petition under section 300, subdivision (b), alleging one count. The petition's count b-1 alleged: Father "created a detrimental and endangering home environment for the children in that . . . father possessed a half pound of methamphetamine, half pound of cocaine, and a loaded firearm in the children's home, within access to the children. On 03/08/20 [father] was arrested for possession of drugs and a loaded firearm. The mother failed to protect the children by allowing [father] to reside in the home and have unlimited access to the children. Such a detrimental[ ] and endangering home environment established for the children by the [father] and failure to protect by the mother endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of serious physical harm, damage, danger, and failure to protect."

The juvenile court held a detention hearing on March 20, 2020. The court concluded that a prima facie case existed that Ariana and Adrian were persons described by section 300 and that reasonable efforts had been provided to prevent removal.[4] The juvenile court detained Ariana and Adrian from father and released them to mother. The court ordered DCFS to provide family maintenance services to mother and reunification services to father. Father was granted monitored visitation.

---

[4] The reporter's transcript reflects that based on Jorge R.'s absence from the proceedings, the juvenile court made no findings regarding Lilianna or Izabelle and on DCFS's recommendation allowed them to remain released with mother. At the jurisdiction and disposition hearing, father requested presumptive parent status for Lilianna and Izabelle. The court denied father's request, and father has not challenged that order here.

The juvenile court initially set hearings for jurisdiction and disposition of DCFS's petition for May 20, 2020. Accommodating for scheduling issues created by COVID-19, the juvenile court continued that hearing and then eventually held it remotely on September 8, 2020.

In anticipation of the jurisdiction and disposition hearing, father told DCFS that he had enrolled in an online parenting class and in a drug and alcohol program, but DCFS was unable to confirm father's enrollment or participation. DCFS visited the family's home monthly and observed no safety concerns and observed no signs of father's presence in the home. Mother denied any in-person contact between father and the family. Mother did, however, tell DCFS that she "want[s] to work on" her relationship with father; that she "know[s] he feels bad for all of this," and that it would "take [her] some time to trust him with the kids and who he brings around the house and the kids." Ultimately, mother told DCFS that she does not believe father "would want to put us through this again."

After his March 12, 2020 interview, father declined to answer any questions about the facts alleged in DCFS's petition. Father "stated he has been advised by his criminal court attorney not to speak to DCFS about the current petition by telephone," and although father indicated he was willing to speak to DCFS in person, COVID-19 social distancing guidelines prevented DCFS from conducting an in-person interview. Shortly before the September 8, 2020 hearing, DCFS reported to the court that father was out of jail on bail pending further proceedings in his case.

After hearing from the parties at the September 8, 2020 hearing, the juvenile court amended the petition to remove the

words "half pound of" before the word "cocaine" in the single count (b-1), and sustained the petition as amended.

In ruling, the trial court stated: "What is not in question . . . was that there was both methamphetamine, cocaine, and a loaded firearm in the home's garage. . . . [¶] . . . The court notes that the evidence as to the . . . father is not in significant question. The court finds the denials of the . . . father to be not credible. [¶] The evidence before the court indicates not only that there was ongoing drug sale activity going on out of the garage, which was a place where the oldest children were sometimes present, had access to obtain things from the garage, at least some times, but also that there were illicit substances found on the father's person when he was arrested by the police." This evidence, the juvenile court concluded, "indicates that the drug activity was not limited simply to the garage, as the father was carrying drugs to another location. [¶] The presence of this kind of illicit activity, the danger of which is also illustrated by the loaded weapon which was found with the drugs in the garage, indicates a highly dangerous, volatile activity going on operated by the father near the children in the garage for their home and including the father having drugs on his person. [¶] So the father carrying illicit substances in his clothing when he has regular access to the children is certainly conduct which places them at substantial risk of harm, of suffering serious physical harm."

The juvenile court concluded that Ariana and Adrian were persons described by section 300, subdivision (b). The court removed the children from father. The court also sustained the petition as to mother, but placed the children in the custody of DCFS and released them to mother. The court ordered family

8

maintenance services, and ordered monitored visitation for father.

Father filed a timely notice of appeal.[5]

## DISCUSSION

"A child may come within the jurisdiction of the juvenile court under subdivision (b) of section 300 if the 'child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child.' (§ 300, subd. (b)(1).)  In order to sustain a petition under section 300, a significant risk to the child must exist ' "at the time of the jurisdiction hearing." '  [Citations.] DCFS 'has the burden of showing specifically how the minor[ ] ha[s] been or will be harmed.'  [Citation.]  Evidence of past conduct may be probative of current conditions, and may assist DCFS in meeting this burden.  [Citations.]  However, DCFS must establish a nexus between the parent's past conduct and the current risk of harm."  (*In re J.N.* (Apr. 2, 2021, B308879) ___ Cal.App.5th ___ [pp. 7-8].)

"We review the trial court's findings for substantial evidence.  [Citation.]  We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. [Citation.]  The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.  [Citation.]  [¶] Substantial evidence must be of ponderable legal significance.  It

---

[5] Again, mother has filed no notice of appeal, and no issues have been raised implicating Lilianna or Izabelle.

9

is not synonymous with 'any' evidence.  [Citation.]  The evidence must be reasonable in nature, credible, and of solid value.  [Citation.]  The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order."  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

Father contends that the evidence before the juvenile court is insufficient to demonstrate either the existence of any risk to the children or any nexus between father's conduct and that risk.  Father acknowledges that the record demonstrates that he was "selling drugs out of his garage and at his favorite local bar where he was arrested with drugs on his person."  Nevertheless, he argues, DCFS did not demonstrate that the children had ever suffered any injury or harm as a result of him selling drugs out of the family home before the children were detained.  We disagree with father's contentions.

In its reports to the juvenile court, DCFS identified evidence from father's March 8, 2020 arrest indicating that father had been engaged in drug sales from *at least* January 2020 to March 2020.  When deputies searched the family home after arresting father, he told them the contents of and directed them to the location of the backpack containing drugs and paraphernalia for packaging the drugs for sale, as well as a loaded gun capable of being fired.

DCFS argues that this case is similar to *In re Yolanda L.* (2017) 7 Cal.App.5th 987 (*Yolanda L.*).  In *Yolanda L.*, the father of a four-year-old and a six-month-old was arrested as a result of a "narcotics investigation by a multi-agency task force including the Drug Enforcement Agency."  (*Id.* at p. 989.)  Father was pulled over and officers found three pounds of crystal

10

methamphetamine in father's vehicle.  (*Id.* at p. 990.)  "Father told [an officer] that there was a gun in a bag in a hall closet at the family home."  (*Ibid.*)  Officers found the loaded gun and ammunition in a closet in the family home.  (*Ibid.*)

The *Yolanda L.* court pointed out that "section 300, subdivision (b) dependency jurisdiction was based on two forms of neglectful conduct by father:  (1) storing a loaded handgun in a location that was accessible to the children and (2) possessing the three pounds of methamphetamine found in his car."  (*Yolanda L.*, *supra*, 7 Cal.App.5th at p. 994.)  "Both forms of neglectful conduct," the court explained, "put the children at substantial risk of suffering serious physical harm.  And although the conduct was discovered on September 29, 2015, there was substantial evidence from which the juvenile court could infer that the conduct was likely to recur and did not represent a momentary lapse in judgment."  (*Ibid.*)

The court in *Yolanda L.* rejected arguments similar to those father makes here.  There, father argued that the children would not have been exposed to drugs that were found in father's truck.  The court explained, to the contrary, that "it was reasonable for the juvenile court to infer that father's use of the truck to engage in large scale drug trafficking exposed the children to a risk of harm because they were sometimes in the truck.  Further, from the evidence that father stored a loaded gun in an easily accessible location in the family home, and a police dog 'alerted' to a couch in the living room, the juvenile court could reasonably conclude that father's drug trafficking activities did not occur only in the truck, but sometimes in the family home."  (*Yolanda L.*, *supra*, 7 Cal.App.5th at p. 994.)

11

As to the loaded firearm, the court dismissed the father's argument summarily: "It takes little to persuade us that a young child with access to a loaded gun is at substantial risk of serious physical harm." (*Yolanda L.*, *supra*, 7 Cal.App.5th at pp. 994-995.)

In reply, father focuses exclusively on whether the children would have access to the loaded firearm deputies found in the family's laundry room and largely ignores the *Yolanda L.* court's discussion of father's drug trafficking. "Jurisdiction does not lay without ready access to the gun," father argues, citing *In re C.V.* (2017) 15 Cal.App.5th 566, 572. In *In re C.V.*, however, "the shotgun found in a backpack wedged between the mattress and the bedroom wall was not loaded. [And] the only child in the household[ ] was three months old when the police found the gun. Even an above-average three month old would be incapable of reaching the backpack or opening it to find the unloaded gun. Given his age, C.V. cannot be said to have had access to the unloaded shotgun in the backpack." (*Ibid.*)

Father's reliance on *In re C.V.* is misplaced. The youngest of the four children in father's care—Adrian—was just shy of two years old when deputies found the loaded gun and bag full of drugs in the family's laundry room. The oldest child in the home was 11. Although the two youngest children were too young at the time to make meaningful statements to DCFS, the two older children reported that they had access to the garage (and therefore to the laundry room attached to it) and that they were never told to stay out of the garage. The court may have reasonably inferred that the children had access to the laundry room, and that they could have accessed father's loaded and operable firearm. Like the court in *Yolanda L.*, "[i]t takes little to

12

persuade us that a young child with access to a loaded gun is at substantial risk of serious physical harm." (*Yolanda L.*, *supra*, 7 Cal.App.5th at pp. 994-995.)

Moreover, *In re C.V.* did not involve the added layer of father's drug business.

Father argues here that his drug business was operated from the garage and the children were not exposed to it. But again, we disagree. As the juvenile court pointed out, this case did not *only* involve drugs found in the family's laundry room (where the children may well have been exposed to them), but father had them on his person when he was arrested. The juvenile court could reasonably have concluded that the drugs deputies found on father when he was arrested are not the only drugs he ever had on his person outside of the garage and in a context that, at the very least, implied the children were exposed to father's drug business.

Father's argument also emphasizes that DCFS "must be specific about the magnitude of the potential harm [to the children] and the likelihood of its occurrence." Father's argument overstates the level of specificity with which DCFS must identify the harm that may befall the children based on father's choices. We have explained that DCFS's inability to predict *precisely* how children *will* be harmed does not defeat jurisdiction; rather, it is sufficient that father's drug trafficking creates a substantial risk of *some* serious physical harm to the children. (See *In re Travis C.* (2017) 13 Cal.App.5th 1219, 1227.)

Even if DCFS were required to operate at the level of specificity father urges, it did so here. DCFS identified with precise specificity the future harm in which father placed the

children. In its detention report, DCFS identified the following risks to the children:

- "The father . . . continued to place the children . . . at risk by knowingly storing an[ ] estimate of ½ pound of meth and ½ ounce of cocaine in his garage that was accessible to the children.
- "Additionally, a loaded firearm was found inside a . . . backpack inside the garage.
- "*The amount of drugs and the amount of value of the drugs found . . . suggest that there is probability that this was not the first incident of father being involved in the possession of drugs.*
- "This places the children at further risk of physical harm if released to the care of father as there is no guaranty that the children will be safe while in the care of father.
- "*Furthermore, the children will be placed in danger as there could be a possibility of retaliation for the product that father lost as it was such a high amount of money that father no longer has in his possession.*" (Italics added.)

Father's actions did not represent a momentary lapse of judgment; his drug operation had been under surveillance for weeks before he was arrested. Father's responses to DCFS's inquiries during the pendency of its investigation minimized the effect of his choices on the children in his care and failed to provide any assurance that he both understood the significance of his choices and would avoid repeating them in the future. Furthermore, mother's stated desire to reconcile with father— even if she also voiced reservations—may have led the juvenile court to the reasonable conclusion that, absent juvenile court

14

intervention, the children may well continue to be exposed to the risks inherent in father's drug business.

Our review of the record reveals evidence sufficient to support the juvenile court's conclusions that father's actions created a substantial risk that the children would suffer serious physical harm.  We do not view either the drug sales from the family home or the presence of a loaded firearm in the family home in isolation; we view them as part of the father's drug business enterprise.  DCFS met its burden in the juvenile court of identifying the risk of harm to the children.  And the evidence supports the juvenile court's conclusion that the risk of future harm continued to exist as of the date of the jurisdiction and disposition hearing.

## DISPOSITION

The juvenile court's orders are affirmed.
NOT TO BE PUBLISHED


CHANEY, J.

We concur:


ROTHSCHILD, P. J.


FEDERMAN, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15