Filed 8/31/17; Certified for Publication 9/13/17 (order attached)
Received for posting on 9/20/17

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re C.V., a Person Coming Under the Juvenile Court Law. | B278331 (Los Angeles County Super. Ct. No. DK18967) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JAZMIN V. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Philip L. Soto, Judge. Reversed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant Jazmin V.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant Richard V.

Mary C. Wickham, County Counsel, R. Keith Davis, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————

Jazmin V. (mother) and Richard V. (father) appeal from the disposition order of the juvenile court finding jurisdiction over C.V. We reverse.

A petition filed August 26, 2016 alleged that under Welfare and Institutions Code section 300, subdivision (b),[1] father and mother failed to protect then three-month-old C.V. and put him in danger of harm "in that a rifle and ammunition were found in the child's home within access of the child." Mother knew father possessed the firearm and ammunition in the home, and father had a criminal history involving firearms and had been arrested for felon in possession.

When the social worker responded to an immediate response referral at mother's home (the home of the maternal grandparents) on August 16, a deputy informed her that father had been arrested for violation of probation and would be in custody for a " 'good amount of time.' " Law

---

[1] All further statutory references are to the Welfare and Institutions Code.

enforcement had confiscated a bag containing a .22-caliber rifle and live ammunition, which they found next to the bed in mother's bedroom, where mother and father slept with C.V. There were no additional concerns regarding abuse or neglect by mother.

Mother told the social worker that father did not live with her but spent the night once or twice a week. She knew father was a gang member, and recently learned father had been unfaithful. The day before mother had told him to leave, but he refused; she also knew about the rifle and had asked father to get rid of it. Mother signed a safety plan stating she would not allow father onto the premises, and an affidavit stating she would not have any weapons in the home, which was otherwise free from hazards. D.V. showed no signs of neglect or abuse. Mother understood the hazards of sleeping with the baby and promised to obtain a crib.

The police report stated that Father was detained and arrested while running out of the back of the house. When the deputies opened a backpack "wedged in between the mattress on the floor and the south wall" of the bedroom where mother and father slept with C.V., they found a rifle in working condition with a sawed-off barrel and stock, a box of ammunition, and a magazine with seven live rounds. Father told the deputies he bought the rifle from a homeless man and sawed off the barrel and stock the day before. He needed the gun because he was a member of the Pomona "12th Street Sharkies," was covered with gang tattoos, and did not get along with gang members in Los Angeles.

Mother told the deputies that she knew nothing about the rifle or the ammunition, and promised she would not allow father in the home when he was released. She agreed father's items should be removed from the home.

The social worker believed further supervision was necessary as "[a]ll the items located in the home were in complete and unlimited access to the children in the home. Additionally, the father is an active gang member who reported that he does not get along with gang members in the Los Angeles area and exposing his family to danger and retaliation by rival gang members. Living under the care of father can be categorized as 'Very High' for future risk of general neglect."

An addendum report recommended that C.V. be detained in mother's custody with monitored visits for father, and that mother and father participate in individual and family counseling, parenting classes, and substance abuse rehabilitation programs.

At the detention hearing on August 26, 2016, the court detained C.V. in mother's custody, found father was the presumed father, and ordered Department of Children and Family Services (DCFS) to assess visits for father while in custody, with monitored visits for father once released.

In the October 5, 2016 jurisdiction and disposition report, mother stated that when father visited she had trouble sleeping, " 'scared that someone would come and shoot or go through the window.' " She allowed him to visit because it was the only time he could see C.V., and he told

her he would try to do better and would have his face tattoos removed.  The night before father was arrested he showed her the gun outside, and told her it belonged to friends.  Mother told him she didn't want the gun in the house and she wanted him to "go back where he had come from," and Father said he would leave in the morning.  She did not know the gun was next to the bed.  If father showed up again she would tell him to leave.

Father, interviewed in custody, said he had recently bought the gun from a homeless man and planned to sell it, denying that he and mother fought about it.  He was a gang member and " 'on the run from probation.' "  Although he had considered getting his face tattoos removed, he was afraid that if he went in they would report him.  He loved his son and before his arrest he had gone back and forth between mother's home and his sister's house, where he planned to stay after his release.

The report concluded that mother failed to protect C.V. from father's criminal activity, and "although the mother may not have been aware [of] the gun she lied to law enforcement stating that father was not at the residence."  Father's gang activity made mother fearful when he stayed at the home.  Mother continued to live with her parents, which provided some protection for C.V.  DCFS recommended that the court sustain the petition, provide family maintenance services for mother and family reunification for father, monitored visitation for father, and parent education and counseling for both parents.

Mother and father were present at the jurisdiction hearing on October 5, 2015. Counsel for DCFS and for C.V. submitted on the recommendations in the report. Father's counsel stipulated that he had been convicted and sentenced to 32 months.

Father's counsel asked the court to dismiss the case. Father was under a 32-month sentence and did not pose a risk to C.V., who was safe with mother. C.V. was only five months old and could not access, and was not endangered by, the rifle or ammunition. Father did not live with mother, and she did not know where the rifle and ammunition were. "I don't believe that every time there's a criminal case we need a correlating dependency case." Mother's counsel agreed. No drugs were in the home. Father was simply in violation of probation, the police found a gun, and he had been convicted. The gun was not within C.V.'s access, and there was no current risk to C.V.

The court asked, "Is she willing to give up on this man or is he willing to give up on this child? Is she willing to have me consider a permanent restraining order for five years so he stays away from her and the child?" Mother's counsel explained that because father was in custody she had not discussed a restraining order with mother, who had told father he could not be in the home. The court continued, "But it's not just that. It's his whole criminality, his background, his lack of stability, his bringing—putting this child in a position where this child can be put at risk even if he does not come back with a gun." Although father would

6

be in jail for 32 months, the court insisted on a five-year restraining order before it would consider closing the matter: "[Y]ou can train somebody not to use drugs. You can't train someone not to have a gun. Either they are going to have a gun, or they are not going to have a gun." Guns would be prohibited by a restraining order, and "[t]his court will not close this case unless I know that this mother and the child are protected."

Father's counsel protested that there was not enough evidence for a restraining order, as there had been no domestic violence, the only issue was father's possession of the firearm, and he had been sentenced to almost three years imprisonment, which was typically the longest period for restraining orders in juvenile court. Mother's counsel stated that mother would not request a restraining order because father had been trying to straighten out his life and she did not feel he was a danger to her: "He made a mistake and tried to make money by selling the gun."

The court stated that Father had violated the probation condition that he not possess a firearm, and no programs could keep him from having an illegal weapon. Because father was not supposed to have the gun, "I can't trust him. Frankly, I can't trust the mom really if she believes this kind of thing. [¶] It sounds to me like as soon as he gets out, he's going to be right back in this house with this baby, and we are very likely going to have a situation where he's going to bring some criminality into the house that puts the child at risk again." The court sustained the

petition as to both mother and father, and released C.V. to mother, warning her not to let father visit: "We are going to be doing unannounced home visits. If they find him there, the first thing they will do is take the child away. If they can't find a relative or a family friend to give the child to, then it's going to go into foster care." Mother and father both stated that they understood that father was not to go to mother's home. Father's counsel asked for visitation in the visitation room at the place of incarceration, and the department objected that C.V. was very young. The court ordered monitored visits after father's release with a neutral monitor at a neutral location, and mother could take C.V. to visit father in custody "if the incarcerating facility allows for visits with the child as young as this child." The court ordered mother to complete parenting classes and individual counseling, and mother's counsel objected because mother's parenting was not in issue. The court ordered father to complete parenting classes, and individual counseling after his release. Over objection of father's counsel, the court also ordered father to comply with all terms and condition of probation and stay 300 yards away from mother and C.V. except during authorized visits.

Father and mother filed timely appeals.

## DISCUSSION

At the request of DCFS, we took judicial notice of a May 2, 2017, juvenile court order terminating jurisdiction, and a family law order awarding sole physical custody of C.V. to mother and joint legal custody to father, who

8

continued in custody. DCFS urges us to dismiss this appeal as moot. We agree with mother and father, however, that the juvenile court's finding of jurisdiction over C.V. creates the possibility of prejudice to both mother and father in subsequent family law or dependency proceedings, and "in an abundance of caution and because dismissal of the appeal operates as an affirmance of the underlying judgment or order [citations], we consider the merits of [the] appeal." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) The motion to dismiss is denied.

To review mother and father's claim that the juvenile court's finding of jurisdiction is not supported by substantial evidence, we review the entire record, drawing all reasonable inferences to support the findings and orders of the juvenile court, construing the record in the light most favorable to the court's determinations, and acknowledging that factual and credibility issues are the trial court's province. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) Even this deferential review shows that no evidence of a sufficiently substantial nature supported the jurisdictional finding.

A juvenile court may find jurisdiction under section 300, subdivision (b)(1) where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1).) Jurisdiction under subdivision (b) is warranted when the evidence supports (1) neglect by the parent,

9

(2) causation, and (3) serious physical harm or illness, or a substantial risk of such serious harm. (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993 (*Yolanda L.*).) "When the jurisdictional allegations are based solely on risk to the child, that risk must be shown to exist at the time of the jurisdiction finding." (*Ibid.*) Jurisdiction "may not be based on a single episode of endangering conduct in the absence of evidence that such conduct is likely to reoccur." (*Ibid.*)

Citing cases from other jurisdictions finding child endangerment when parents left loaded guns within the reach of children, *Yolanda L., supra,* 7 Cal.App.5th 987 found as a matter of first impression that "section 300, subdivision (b) dependency jurisdiction may be based on evidence that the parent stored a loaded gun in such a manner that it could be accessed by a child." (*Id.* at p. 995.) Division Eight of this district rejected father's argument that a loaded handgun did not present a risk of harm to the two children, then four years old and six months old, because the loaded gun was in a bag and on a closet shelf four feet from the floor: "Concealing an item in a bag would not deter a normal four year old from seeking to find out the contents of that bag. In addition, the average four year old can reach a shelf that is only four feet from the floor, and is capable of scooting a chair over and climbing up on it to reach items placed up high." (*Id.* at p. 996.)

The facts in this case are quite different. First, the shotgun found in a backpack wedged between the mattress and the bedroom wall was not loaded. Second, C.V., the only

child in the household, was three months old when the police found the gun.  Even an above-average three month old would be incapable of  reaching the backpack or opening it to find the unloaded gun.  Given his age, C.V. cannot be said to have had access to the unloaded shotgun in the backpack.  No substantial evidence exists that at three months, C.V. was at substantial risk of serious harm from an unloaded firearm inside a backpack wedged between the bed and the wall.

Further, even had C.V. been at risk, no such risk existed at the time of the jurisdictional hearing, when C.V. was five months old.  Father had recently been sentenced to 32 months imprisonment,[2] removing any possibility he would return to mother's home so as to put C.V. at substantial risk of harm.  Further, mother had been ordered, and had promised, not to allow father in the home after his release.

DCFS cites a potential risk of "police raids, gang retaliation, shoot-outs in the home," based on father's admitted gang membership and his possession of the

---

[2] The jurisdiction/disposition report stated that on September 26, 2016, a sheriff's deputy told the social worker that the case was rejected by the court and father was scheduled for release on November 7, 2016.  However, the parties stipulated at the October 5, 2016 hearing that father had been sentenced to 32 months, and father was still incarcerated in May 2017 when jurisdiction was terminated.

11

firearm.  Again, these risks are not supported by substantial evidence, given that there was no evidence of any such past events and at the time of the jurisdiction hearing father had just been sentenced to 32 months incarceration.  Further, DCFS does not argue that evidence that one parent is a gang member, without more, can serve as a basis for taking jurisdiction of a child.

We reverse the order finding jurisdiction as to mother and father.

### DISPOSITION

The order is reversed.

JOHNSON, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.

12

Filed 9/13/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re C.V., a Person Coming Under the Juvenile Court Law. | B278331<br>(Los Angeles County<br>Super. Ct. No. DK18967) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>JAZMIN V. et al.,<br><br>     Defendants and Appellants. | CERTIFICATION AND ORDER FOR PUBLICATION |

The opinion in the above-entitled matter filed August 31, 2017, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


JOHNSON, J.        ROTHSCHILD, P. J.        CHANEY, J.