Filed 1/16/25  In re K.C. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.C., a Person Coming Under the Juvenile Court Law. | B332715 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.F.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 23LJJP00203A |

APPEAL from orders of the Superior Court of Los Angeles County, Jennifer W. Baronoff, Juvenile Court Referee.  Reversed and remanded with directions.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, for Plaintiff and Respondent.

Mother appeals from the juvenile court's assertion of jurisdiction and its dispositional judgment as to her son K.C. The juvenile court declared K.C. and two of his younger half siblings dependents of the court after mother had been arrested for child endangerment for walking in the street with the two younger children, and after mother had admitted to substance abuse and mental health issues. After declaring K.C. a dependent, the juvenile court terminated its jurisdiction as to him and entered a juvenile custody order awarding father sole legal and physical custody. Mother contends there was no substantial evidence that K.C.—who did not live with mother and had lived with father for the past six years—was at substantial risk of serious harm due to mother's conduct. We agree and reverse the juvenile court's orders as to K.C.

**FACTUAL AND PROCEDURAL BACKGROUND**

Mother and father, who is not a party to this appeal, share one child, K.C. (born September 2009). Mother has other children with different fathers. Two of them—J.C. (born January 2018) and I.W. (born March 2021)—also are the subject of this dependency proceeding but are not the subject of this appeal.

1. *Child-welfare history*

In 2014, the Los Angeles County Department of Children and Family Services (DCFS) initiated a juvenile dependency action on behalf of K.C. and his half sister A.A. (born November 2011)—another of mother's children—on allegations mother and A.A.'s father exposed A.A. to domestic violence. The juvenile

2

court dismissed the petition without prejudice under Welfare and Institutions Code[1] section 301.

DCFS initiated another dependency proceeding in July 2017 on behalf of K.C. and A.A. on allegations mother left A.A. alone for extended periods and her lack of supervision also placed K.C. at risk of serious physical harm. The juvenile court assumed jurisdiction over both children in June 2018 and terminated jurisdiction with custody orders awarding their respective fathers full custody and mother unmonitored visitation.

Mother appealed the orders as to K.C. On March 25, 2019, this court reversed the juvenile court's jurisdictional findings as to K.C. and remanded the matter to the juvenile court with directions to vacate the jurisdiction and custody orders as to K.C. (*In re K.C. et al.* (Mar. 25, 2019, B291186) [nonpub. opn.].) We affirmed the orders as to A.A. (*Ibid.*)

2. ***Events leading to current dependency proceeding***

In June 2023, DCFS received a report alleging a motorist nearly struck mother, who had been walking—at about 4:00 a.m.—in the middle of the street against traffic with J.C. and I.W. Mother was arrested for child endangerment. Further investigation revealed the two children were living with maternal grandmother and aunt because mother was homeless and abused drugs. Mother intermittently lived there. The grandmother and aunt did not know mother had taken the children from the home in the middle of the night.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

3

Law enforcement was concerned because maternal relatives had no legal standing to prevent mother from removing the children from their care if she chose to do so.

A DCFS social worker spoke with a jailer at the sheriff's station who said mother had been uncooperative, was incoherent, and had taken her pants off in the jail cell. The social worker interviewed mother at the jail. Mother said she had been trying to see her children; she wanted to see K.C. "because he [was] in danger." When the social worker questioned mother further, mother just stared and spoke in slow, slurred speech.

The social worker interviewed maternal relatives. Maternal grandmother told the social worker mother would go missing for days at a time, was abusing drugs, and had mental health issues. Mother usually left J.C. and I.W. with maternal grandmother or maternal great-grandmother. Sometimes she took the children with her. At times, the family sent the children to stay with different relatives to prevent mother from taking them and placing them in an unsafe situation. Mother had accused maternal grandmother of kidnapping the children.

Maternal aunt said maternal relatives had taken care of the children " 'for years.' " Mother had been "clean" from the end of March through April but had relapsed in mid-May. Maternal great-grandmother said mother's drug addiction had worsened over the past two years. She stated mother would sneak out of the home with J.C. and I.W. The family was limited in what they could do to protect the children without formal custody orders. The great-grandmother said, " 'We have called authorities, but they don't do anything about it.' " Maternal aunt stated she had tried to stop mother from taking the two children in the past, but that resulted in a physical altercation. In

4

November 2022, maternal great-uncle saw mother using drugs in front of I.W. He intervened, but mother became angry and confrontational. He also said J.C. and I.W. had seen mother get "jumped," apparently by people to whom she owed money for drugs.

K.C. and A.A. lived with their respective fathers. Father told the social worker he had had custody of K.C. for the past six years. He stated he would go to court the next day and ask for a modification to his family law order to restrict mother's visits.[2] Father did not allow mother to visit K.C. unsupervised— he was concerned about her drug use. He also did not allow K.C. to go to maternal grandmother's home alone or to be in the home alone with mother. Father stated he "is present with . . . mother and [K.C.] because he doesn't trust mother's judgment. She is under the influence and unpredictable." He reiterated he "doesn't allow his son to be with mother alone."

Father said K.C. last visited mother—with father—about a week earlier. Mother stayed in the bathroom during his visit. About two months earlier, mother had come to father's home with her two younger children demanding to see K.C.; she was "high." The police took mother back to maternal grandmother's home, "but nothing else was done." Father stated "law enforcement didn't do anything about the situation." Father also said mother had moved in with maternal grandmother about three weeks

---

[2] As discussed, the custody order the juvenile court entered in 2018 was vacated in 2019. There is no custody order in the appellate record other than the order that is part of this appeal. It appears, therefore, that no custody order was in place for K.C. at that time.

5

earlier.  Mother had tried to stay at his home, but father did not want K.C. to see her in that condition:  mother was " 'incoherent sometimes' " and was " 'in and out of it, and bizarre sometimes.' "

Father reported mother had involved K.C. in shoplifting. In May 2023, K.C. went shopping with mother while father waited in the car.  Mother " 'had promised . . . to get [K.C.] earrings.' "  After father took mother home, K.C. told him mother had " 'stuffed her basket, and without paying had him push the cart out of the store.' "  Father called mother and confronted her; she hung up.  Father wanted mother to have " 'monitored visits with my son, and for her to go to rehab.' "

K.C. confirmed he visited mother while father was present. He knew about mother's drug abuse from others.  K.C. could tell mother was under the influence during most of their visits—she would lose focus and fall asleep.  K.C. told the social worker he wanted mother to get better so that mother could talk to him and see him.  K.C. also confirmed the shoplifting incident.  He said mother had returned items she hadn't purchased and left with the items she couldn't return.  He stated there had been a similar incident a year earlier when he was with mother and A.A., but he had not told father about it.

A.A.'s father let A.A. visit maternal grandmother's home but asked the family not to leave A.A. alone with mother. According to A.A., mother " 'gets high inside the bathroom at [maternal] grandmother's house.' "  A.A. said maternal grandmother " 'doesn't let us go around my mother when she is on drugs.' "  A.A. had been spending the night at maternal grandmother's house when mother took J.C. and I.W.

J.C. and I.W. were detained from mother and placed with maternal great-uncle. K.C. remained in father's care. DCFS recommended a family law order "be set in place for . . . father to get sole physical custody of [K.C.] with monitored visits with . . . mother."

On June 15, 2023, DCFS filed a section 300 petition on behalf of K.C., J.C., and I.W. The petition alleged K.C. came within section 300, subdivisions (b)(1) and (j). As relevant to K.C., the petition alleged the child was at risk of serious physical harm based on (1) mother's failure to provide for J.C. and I.W. and having left them with maternal relatives without having created an appropriate plan for their supervision (counts b-1 and j-1); (2) mother's "history of mental and emotional problems, including visual and auditory hallucinations, spatial thoughts, delusion, hostile behaviors, aggression, self-harming behaviors, paranoia, incoherent thoughts and statements, and erratic and impulsive behaviors" that rendered her incapable of regularly caring for and supervising the children, self-harming behavior in January 2023, and her failure "to consistently participate in mental health treatment services" (count b-2); and (3) mother's "history of substance abuse including prescription medication, methamphetamine, and ecstasy," and current abuse of illicit substances that rendered her incapable of regularly caring for and supervising the children, and her having been under the influence while the children were under her care and supervision (count b-3).

Mother did not appear at the June 16, 2023 initial hearing. The juvenile court ordered K.C. detained from mother and released to father.

### 3. *DCFS's reports*

According to the DCFS dependency investigator (DI), mother admitted the first allegation—that she had failed to make an appropriate plan for J.C.'s and I.W.'s care—was true. Mother said the mental health allegation (count b-2) also was true. Mother stated that on the night of the incident, she had been hearing voices telling her she had to take the children because someone was trying to take them from her. She said she hallucinated and heard voices when under the influence of drugs.

Mother further admitted her years-long problem with drugs and that being under the influence of drugs prevented her from caring for her children appropriately—that is why she took the children to her family's home. Mother said she became addicted to Oxycodone and Norco, and her street drugs of choice were fentanyl and methamphetamine. She understood her drug use and untreated mental health issues were harmful to her children. She acknowledged she needed help.

Father reported mother used to leave her younger children with him and his wife for days at a time. There were times when father let mother stay with his family. Father told the DI his co-parenting relationship with mother had gotten progressively worse over the years because mother "became malicious and would keep their son away from him." Father said K.C. had been in his care since he was eight years old when A.A. was taken from mother and K.C. was placed with him. He said mother last saw K.C. when they went to the store and she "had [K.C.] steal stuff." Father did not want K.C. to be around mother if she was going to have him do illegal things.

When the DI interviewed K.C. about the allegations, he "appeared very protective of . . . mother and was careful to only

speak well of her." K.C. stated he never saw mother use drugs but heard others talk about her "being on drugs." He said "he would like to believe that it's not true."

On August 29, 2023, mother, who remained incarcerated, enrolled in the in-custody START program—an eight-week substance treatment and re-entry transition program. Mother also was attending anger management, relapse prevention, domestic violence, parenting, and life skills group sessions.

4.    *Adjudication and disposition*

The court adjudicated the matter on October 11, 2023. The court admitted the DCFS reports and attachments in evidence and heard testimony from K.C. and mother (and from maternal grandmother as to placement of the younger children).

K.C. testified he essentially was in his father's full-time care. Every time he visited mother, father was with him. During visits, mother sometimes "dozed off" while he was talking to her. K.C. answered "yes" when asked if he wanted to live with mother again. When asked if he was "okay with waiting a couple months before moving back in with your mom," K.C. responded, "Yes." Father interjected, "He's not moving back in with her."

K.C. testified he did not want to visit mother currently but would like to see her "[w]hen she's doing better." When asked to describe his relationship with mother, K.C. testified, "I had a good connection with my mom, but I knew she wasn't always there. Like sometimes she was under the influence." K.C. testified he felt more comfortable living full time with father for now. He was aware mother was in a substance abuse treatment program—that made him more comfortable with future interactions with her.

Mother testified.  She again admitted to the allegation that she failed to make an appropriate plan for J.C.'s and I.W.'s care. She agreed her addiction interfered with her ability to parent. Mother admitted she "was on drugs" but testified her drug of choice was fentanyl, not the drugs or prescription medications mentioned in the petition.  She also denied selling drugs.  Mother now denied having any mental health issues, however.  She denied having told the DI she heard voices the night she took J.C. and I.W.

Mother had been participating in the START program and attending anger management classes.  She testified her brother, mother, and husband (I.W.'s father)[3] were her support system. She wanted to participate in services to be able to reunify with K.C.  Mother believed father would allow her to have monitored visits with K.C. if the case closed with a custody order.

The court sustained the petition's allegations pertaining to mother as pleaded under section 300, subdivisions (b) and (j).[4] As to disposition, DCFS asked the court to declare K.C. a dependent and terminate jurisdiction with a family law order providing custody to father and monitored visits for mother. K.C.'s counsel represented K.C.'s "strong preference" was to remain with father.  Counsel argued it was in K.C.'s best interest "to close the case and have him stay with his father."  Mother's

---

[3]     The final count of the petition referred to I.W.'s father's drug abuse and I.W.'s paternal half sibling's dependency status due to I.W.'s father's substance abuse.

[4]     The court dismissed the count relating to I.W.'s father, who was incarcerated.

counsel objected to closing the case. Counsel argued the case should remain open to give mother a chance to reunify with K.C. Counsel asked that K.C. be placed in mother's custody with K.C. to live with maternal grandmother while mother was incarcerated, or alternatively that mother have unmonitored visitation with K.C. If the court were inclined to close the case, mother's counsel asked that parents share custody.

The court sustained the petition and found K.C. was a person described by section 300, subdivisions (b) and (j). The court declared K.C. a dependent of the court, and ordered jurisdiction terminated subject to receipt of a juvenile custody order giving father full legal and physical custody and mother monitored visits. The court noted that, based on mother's testimony, it had become "clear" to the court by mother's "either unwillingness or inability to discuss her mental health issues, her significant substance abuse, that there's a long road ahead for [mother]." The court did not think it was "fair to [K.C.] to keep his case open waiting for his mother to get the help that she so desperately needs when he has a parent who is providing him with stability."

Mother filed a notice of appeal the next day. On October 18, 2023, the court received, signed, and filed the juvenile custody order awarding father sole custody of K.C., with monitored visitation for mother, and terminated its jurisdiction over K.C. We granted mother's application to construe her notice of appeal to include the October 18, 2023 orders and her motion to augment the record with them.

## DISCUSSION

### 1. *Standard of review and applicable law*

" 'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633; *In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) Inferences that are the result of speculation or conjecture, however, are insufficient to support a finding. (*In re B.D.* (2024) 103 Cal.App.5th 315, 324.) " 'The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order.' " (*In re L.B.* (2023) 88 Cal.App.5th 402, 412 (*L.B.*).)

Section 300, subdivision (b)(1) authorizes the juvenile court to assume jurisdiction when, as relevant here, "there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child . . . [or] to provide regular care for the child due to the parent's . . . mental illness . . . or substance abuse." (§ 300, subd. (b)(1)(A), (D).) The statute permits jurisdiction under this subdivision "only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (§ 300, subd. (b)(3).) Thus, "[t]he relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing ' "subject

12

the minor to the defined risk of harm." ' " (*L.B., supra*, 88 Cal.App.5th at p. 411.) The juvenile court need not wait for the child actually to be abused or neglected before it can assume jurisdiction, however. (*I.J., supra*, 56 Cal.4th at p. 773.)

Subdivision (j) in turn authorizes dependency jurisdiction where the child's sibling was "abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." (§ 300, subd. (j).) In determining whether conduct toward the child's siblings places the child at substantial risk of harm, the juvenile court considers "the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (*Ibid.*) " 'The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j). The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.' " (*I.J., supra*, 56 Cal.4th at p. 774.)

" '[A] reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory

13

grounds for jurisdiction are supported by the evidence.' " (*I.J., supra*, 56 Cal.4th at p. 773.)

**2.** ***Substantial evidence does not support finding K.C. was at substantial risk of harm***

Mother does not challenge the jurisdictional findings as to K.C.'s half siblings J.C. and I.W. Rather, she contends substantial evidence does not support the juvenile court's finding that K.C.—who lived with father and was not permitted to have unmonitored contact with mother—was at substantial risk of serious harm due to mother's drug addiction, mental health issues, or inadequate supervision of J.C. and I.W.[5] DCFS argues that, without a formal custody order granting father full custody, K.C. remained at substantial risk of harm. DCFS contends substantial evidence supports "the limited assumption of jurisdiction over K.C. for purpose of granting father sole custody."

Mother engaged in troubling behaviors that she admitted placed J.C. and I.W. at substantial risk of harm. She acknowledged her unresolved drug addiction and mental health issues affected her ability to parent appropriately and that she needed help. The record supports the juvenile court's conclusion that "there's a long road ahead for [mother]."

As to K.C., he confirmed mother was visibly under the influence during his visits with her. He also confirmed mother had involved him in shoplifting on two occasions—a year earlier

---

[5]     DCFS alleged K.C. was subject to the court's jurisdiction under subdivision (j) based on the identical allegations in the b-1 count—that mother failed to make an appropriate plan for J.C.'s and I.W.'s care and supervision.

14

and about a month before mother's arrest.  Mother had demanded to see K.C. two months earlier, requiring father to call law enforcement.  And, at the jail after she had been arrested, mother told the social worker she wanted to see K.C. because he was in danger.

As mother argues, however, K.C. is differently situated from his half siblings.  Even considering the totality of the circumstances, it is unreasonable to conclude K.C. was at similar risk of being left without an appropriate plan of supervision or care because K.C. had not been in mother's care for more than six years.  Except for the occasion when father waited for K.C. in the car while he went into a store with mother (and the incident father did not know about a year earlier), it is undisputed K.C.—in contrast to J.C. and I.W.—never had unmonitored contact with mother and had been living with father full time.  Moreover, K.C., who was 14 years old by the time of the jurisdictional hearing, was able to speak up—and did— if mother acted inappropriately.  J.C. and I.W., on the other hand, were only five and two years old, respectively, when mother left them without an appropriate plan for their care and supervision.  In short, it is not reasonable to infer from mother's inability to care for K.C.'s younger siblings that K.C. was at substantial risk of harm from mother when he had not been alone in her care except for at most two occasions in a public place.

Nor does the record support the findings that K.C. was at substantial risk of physical harm due to mother's substance abuse and mental illness.  Again, it is undisputed K.C. did not live with mother and had been in father's full-time care. The evidence shows mother was under the influence in K.C.'s

15

presence, but there is no evidence K.C. ever was alone with mother when she was under the influence, or when she was suffering from a mental health crisis. Rather, the only inference to be drawn from the record is that father protected K.C. from mother. Father and K.C. both repeatedly stated father always was present when K.C. saw mother. Father stated he did not allow K.C. to go to maternal grandmother's home alone or to be in the home alone with mother. K.C. himself confirmed father always was present when K.C. visited mother. He testified, "Every time my mom came, I was with my dad. So I never left with her." K.C. testified he had been living with father for seven years, enjoyed living with him, and felt safe in his care.

About a month before these proceedings began, father did allow K.C. to shop with mother temporarily unsupervised in a store. There is no evidence mother was under the influence at that time, however. Mother's involvement of K.C. in shoplifting was inappropriate to say the least, but there is no evidence K.C. ever was at risk of physical harm or endangered while in the store with mother. Moreover, father did not allow mother to have unfettered access to K.C.—he drove mother and K.C. to the store and waited for them in the car. Even if that event could be construed as posing a risk of harm to K.C., we cannot reasonably infer from the record that a similar incident could recur in the future to substantiate the jurisdictional finding. (*In re C.V.* (2017) 15 Cal.App.5th 566, 572 ["Jurisdiction 'may not be based on a single episode of endangering conduct in the absence of evidence that such conduct is likely to reoccur.' "].) As soon as K.C. told father about the shoplifting incident, father decided he did not want K.C. to be around mother. According to father, mother in fact had not seen K.C. since then. Nothing in the

record suggests father would allow K.C. again to be alone with mother in a store or otherwise.

We find mother's reliance on *In re A.G.* (2013) 220 Cal.App.4th 675 (*A.G.*) instructive. There, a mother was unable to provide regular care for her children due to her mental illness that included delusions and auditory hallucinations. (*Id.* at pp. 677–678, 684.) The father, who lived in the home with mother and the children, ensured an adult other than mother supervised the children at all times. (*Id.* at p. 684.) The mother had been left alone with the children once, but "no harm to them had been reported." (*Id.* at pp. 677, 684.) The father also slept in the children's room with the door locked when advised to do so, temporarily moved out of the home with the children to protect them from mother, and sought orders in the juvenile court restricting mother's visitation. (*Id.* at pp. 680, 684.) The juvenile court sustained a petition that alleged mother's mental illness endangered the children and terminated jurisdiction with a custody order awarding father sole custody. (*Id.* at pp. 681–682.) Division One of this court reversed the judgment, concluding the juvenile court erred in sustaining a petition based solely on mother's inability to care for the children due to her mental illness where the father "has always been, and is, capable of properly caring for them." (*Id.* at p. 686.)

Here, father similarly protected K.C. by ensuring he was not alone with mother except on one recent occasion—albeit in a public setting—where K.C. also was not physically harmed. Significantly, K.C. did not live with mother and thus was even less likely than the children in *A.G.* to be at substantial risk of harm due to mother's conduct. (See *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1319, 1322 [17-year-old daughter who did not

17

live in home with father was not at substantial risk of harm based on sexual abuse by father of stepsister who lived in the home].)

We acknowledge that in *A.G.*, the parents had initiated divorce proceedings where the father could seek a custody order. (*A.G., supra*, 220 Cal.App.4th at pp. 678, 686.) The appellate court noted "the juvenile court should have dismissed the petition, staying the order until Father obtained from the family court an award of custody to him and monitored visitation to Mother." (*Id.* at p. 686.) Here, in contrast, there was no pending family law case that father similarly could have used to seek a custody order before the dismissal of the petition. The lack of a formal custody order is not a basis to assert dependency jurisdiction, however.

As DCFS concedes, "[a] child shall not be found to be a person described by [section 300, subdivision (b)] solely due to . . . [t]he failure of the child's parent . . . to seek court orders for custody of the child." (§ 300, subd. (b)(2)(B).)[6] Nevertheless, DCFS contends that, "[g]iven the extent of Mother's drug addiction and mental health issues and how they manifestly placed the children at risk, Father rightly received assistance from the juvenile court to get orders in place to protect [K.C.]." DCFS argues father's lack of a custody order "meant Mother

---

[6]    It appears father may have believed the 2018 vacated custody order still was in effect. After learning of the incident with K.C.'s half siblings, he apparently told the social worker he would go to court the next day and ask for "a modification to his family law order as to mother's visits."

18

posed a risk to K.C.," as father "had no legal authority to limit Mother's visits."

We disagree. As the custodial parent, even in an informal custody arrangement, father had the right—indeed, the duty—to protect K.C. from mother by not allowing her to interact with K.C. unless supervised. That is what the record shows father has been doing all along. The record makes clear father will not allow K.C. to have unmonitored contact with mother, nor allow mother to take physical custody of K.C. Father even spoke out of turn at the hearing when mother's counsel posed a question that assumed K.C. would be moving back in with mother, insisting, "He's not moving back in with her."

Nor can we infer from the record that the lack of a formal custody order has affected—or will affect—father's ability to protect K.C. from mother. DCFS argues K.C.'s "safety could not be assured without court orders in place," noting a "history of resistance from police officers to limit [m]other's access to the children without court orders." That history, however, is related to maternal relatives' inability to prevent mother from removing J.C. and I.W. from their care. As law enforcement noted, maternal relatives had no legal standing concerning the children. But as to K.C., father did and does. Moreover, there is no evidence in the record suggesting law enforcement could not prevent mother from taking K.C. from father's home without father's permission. Nor does the record suggest a risk that law enforcement would require father—the parent with whom K.C. lives full time—to surrender K.C. to mother's custody absent a court order awarding custody *to mother*. (See *In re Phoenix B.* (1990) 218 Cal.App.3d 787 [affirming dismissal of dependency petition where the child was released to the father, who was

19

"willing and able to provide for [the child's] care," after mother was involuntarily hospitalized, and that the mother's remedy was to assert her custody rights in family court].)  Indeed, when mother demanded to see K.C. at father's home, law enforcement came—presumably at father's request—and removed mother from father's premises.  Father thus was able to prevent mother from gaining access to K.C. even without a court order.

As DCFS asserts, mother's drug addiction and mental health issues are extensive.  We also agree with DCFS that mother's conduct was "alarming."  There is no doubt mother should not be permitted to have unmonitored contact with K.C. at this time.  But father understood that to be the case—and ensured K.C. was not alone with mother—even before mother endangered K.C.'s half siblings, triggering this dependency proceeding.

The only reason DCFS appears to have included K.C. in the petition with J.C. and I.W. is that father had not yet sought a formal custody order.[7]  As discussed, that is not a valid basis for dependency jurisdiction.  Because we conclude substantial evidence does not support the juvenile court's jurisdictional

---

[7]     DCFS notes that it did not include A.A.—who actually was sleeping at maternal grandmother's home when mother left with J.C. and I.W. in the middle of the night—in the petition because "she was protected by a family law custody order issued in 2018, granting her father primary physical custody."  A.A.'s father also had "indicated he planned to have [m]other's visits restricted in family court."

findings as to K.C., the dispositional orders and judgment as to K.C. also must be reversed.[8]

---

[8] As noted above, the record suggests father was unaware that his previous 2018 juvenile custody order was vacated as a result of this court's reversal of the juvenile court's jurisdiction and disposition orders in 2019. We note father is not a party to this appeal and has no reason to be involved in any ongoing dependency proceedings regarding K.C.'s half siblings. On remand, the juvenile court and/or father's trial counsel should ensure that father is made aware of this court's disposition, so that father may seek custody orders in the family court should he so choose.

## DISPOSITION

The juvenile court's jurisdictional, dispositional, and custody orders and judgment as to K.C. are reversed. The matter is remanded with directions to the juvenile court to vacate the adjudication and custody orders relating to K.C. and to enter a new order dismissing the petition as to K.C.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, Acting, P. J.

We concur:

ADAMS, J.

HANASONO, J.[*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.