Filed 5/11/26  In re Isabella M. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ISABELLA M., a Person Coming Under the Juvenile Court Law. _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  SHAKIRA S.,  Defendant and Appellant. | B347116  (Los Angeles County Super. Ct. No. 22CCJP01148D) |

APPEAL from an order of the Superior Court of Los Angeles County, Debra L. Losnick, Judge.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

Shakira S. appeals from the juvenile court's order following a six-month review hearing under Welfare and Institutions Code section 366.21, subdivision (e).[1] Shakira argues substantial evidence did not support the court's finding that returning her daughter Isabella M. to Shakira would create a substantial risk of detriment to Isabella's safety, protection, or physical or emotional well-being. Shakira also argues substantial evidence did not support the court's finding by clear and convincing evidence the Los Angeles County Department of Children and Family Services provided reasonable reunification services. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

As we described in our opinion in Shakira's previous appeal (*In re Isabella M.* (Feb. 10, 2026, B342827) [nonpub. opn.]) (*Isabella M. I*), in February 2024 the Department received a report 13-year-old Isabella did not want to go home because Shakira physically and verbally abused her when she wore

---

[1] Statutory references are to the Welfare and Institutions Code.

2

makeup. Shakira said that she did not allow Isabella to wear makeup, have a cellphone, or use social media and that Isabella had difficulty following her rules. She denied physically disciplining Isabella. Shakira said that, after Isabella was assaulted by a classmate two years earlier, she began skipping school, getting in fights, and stealing. Shakira stated Isabella refused to participate in therapy. Shakira said that Isabella falsely accused Shakira of physically abusing her because she wanted the Department to remove her and that Isabella enjoyed the freedom she experienced during a previous stay in foster care. Isabella's older half-siblings stated that Shakira never hit them or Isabella, that Isabella was upset because Shakira did not let Isabella wear makeup, and that Isabella lied when she did not get her way. (*Isabella M. I*, *supra*, B342827.)

At a detention hearing in March 2024 the juvenile court removed Isabella and ordered monitored visitation for Shakira. At a jurisdiction hearing in August 2024 the juvenile court sustained one count under section 300, subdivision (b). The court found Shakira had "'a limited ability to provide appropriate care and supervision due to [Isabella's] behavioral issues and [her] refusal to return home,'" which endangered Isabella's physical and emotional health and well-being and placed her at substantial risk of serious physical harm or illness. At a disposition hearing in October 2024 the court removed Isabella and ordered Shakira to participate in individual counseling, parenting classes, and conjoint counseling if recommended by Isabella's therapist. The court ordered monitored visitation. We affirmed the order removing Isabella from Shakira. (*Isabella M. I*, *supra*, B342827.)

At the six-month review hearing in April 2025 the court found that returning Isabella to Shakira would create a substantial risk of detriment to Isabella, that continuing her current placement was necessary and appropriate, and that the Department had provided reasonable reunification services. The court stated that, because Isabella requested conjoint counseling with Shakira, the court would continue reunification services to give Isabella "a chance to see if she can mend the fences with her mom." The court ordered the Department to arrange conjoint counseling as soon as possible once Isabella developed a rapport with her new therapist. Shakira appealed from the court's orders.

## DISCUSSION

A.     *Applicable Law and Standard of Review*

At the six-month review hearing the juvenile court "shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).) The Department has the burden of proving detriment. (*Ibid.*; see *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.) In addition, "[i]f the child is not returned to their parent or legal guardian, the court shall determine by clear and convincing evidence whether reasonable services that were designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the continued custody of the child have been

4

provided or offered to the parent or legal guardian . . . ." (§ 366.21, subd. (e)(8); see *In re A.O.* (2025) 111 Cal.App.5th 1048, 1061.)

We review the juvenile court's findings for substantial evidence. (*L.C. v. Superior Court* (2024) 98 Cal.App.5th 1021, 1034; see *In re A.L.* (2015) 243 Cal.App.4th 628, 645.) We "draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence to the contrary." (*A.L.*, at p. 645; see *In re C.V.* (2017) 15 Cal.App.5th 566, 571.) In reviewing the court's finding the Department provided reasonable reunification services, we "'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by [the clear and convincing] standard of proof.'" (*In re A.O.*, *supra*, 111 Cal.App.5th at p. 1062; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996 ["when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true"].)

B.   *Substantial Evidence Supported the Juvenile Court's Finding That Returning Isabella to Shakira Would Be Detrimental to Isabella*

Shakira argues substantial evidence did not support the juvenile court's finding that returning Isabella to Shakira would create a substantial risk of detriment to Isabella's safety, protection, or physical or emotional well-being. She argues that she completed four sessions of individual counseling and that at

the April 2025 six-month review hearing counsel for Isabella stated Isabella wanted to pursue conjoint counseling.

"'In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services,'" as well as "'the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement.'" (*In re E.D.* (2013) 217 Cal.App.4th 960, 966; see *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.) Substantial evidence supported the juvenile court's detriment finding. First, Shakira had only begun to comply with her case plan. At the disposition hearing in October 2024 the court ordered Shakira to participate in individual counseling and parenting classes, but she did not begin individual counseling until March 27, 2025, and she had completed only four sessions by the April 2025 six-month review hearing. Shakira asked for referrals to parenting classes on March 28, 2025, but had not yet begun attending classes.

Second, and more importantly, the juvenile court could reasonably conclude Shakira had not yet developed the parenting techniques necessary to handle Isabella's defiance and hostility. As discussed in *Isabella M. I*, *supra*, B342827, Isabella had significant behavioral issues: She skipped school, was suspended for fighting, was disrespectful and defiant toward Shakira, and consistently stated she did not want to return home. During Isabella's first eight months in foster care, the few interactions she had with Shakira were brief and confrontational. Isabella ended their only in-person visit after five minutes, saying she hated Shakira and wanted to leave. During a telephonic meeting Isabella told Shakira, "I hate you, just kill yourself." (*Isabella M. I*, *supra*, B342827.)

6

The court-appointed psychologist stated Shakira's "authoritarian parenting style," which "placed a 'strong emphasis on outward compliance and rule-following from Isabella,'" "posed 'several safety risks to Isabella's well-being and development,' including 'emotional and psychological harm' and a tendency to 'exhibit increased aggression outside the home.'" The psychologist "recommended Shakira participate in parent education programs to learn 'authoritative parenting techniques and positive discipline methods' and 'shift her focus from superficial compliance to supporting Isabella's emotional and psychological well-being.'" (*Isabella M. I*, *supra*, B342827.)

In the six months between disposition and the first review hearing in April 2025, Shakira began individual counseling, which was a positive development. Unfortunately, there was no evidence that Shakira had developed new parenting techniques, that Isabella had become more emotionally stable, that their relationship had improved, or that Isabella was open to returning home.

In January 2025 Isabella's caregiver "reported that Isabella was self-isolating, not eating, and sleeping all day." Isabella also refused to meet with her mental health providers. The Department reported that Isabella often walked around the school campus rather than attending classes and that she refused to participate in testing necessary to get an IEP.[2] In March 2025

---

[2] "An 'IEP' is an '"individualized education plan,"' that is, 'a written statement for the child developed in a participatory process involving parents and school personnel' that 'describes the child's needs, academic and functional goals, and . . . the special education, related services, and program modifications

Isabella was suspended for "acting verbally aggressive towards school staff" and "bleaching her hair on the school campus." Isabella received "wraparound services" from a facilitator, a child and family team specialist, and a therapist, but she complained that she did not like them and that she was too tired to meet with them, and she stopped participating. Isabella met with a psychiatrist, but she refused medication. In April 2025 Isabella had not yet met with a newly assigned therapist.

Though the court ordered semi-weekly monitored visitation, Isabella generally refused to visit Shakira. The record describes only two in-person visits between October 2024 and April 2025, neither of which went well. At the first visit in December 2024 Isabella became upset because Shakira did not bring her dog and called Shakira names; the social worker had to end the visit. At the second visit in April 2025 Shakira "was shocked to see Isabella's hair had been bleached and cut," and Isabella began to cry. Isabella said she wanted a "new look" to "fit in at school." Isabella said that Shakira did "not allow her to go anywhere or do anything" and that there were "so many activities that she no longer wants to do because they remind her of her mother." Isabella complained Shakira did not "allow her to hang out with any friends," even while in foster care, and Shakira asked "why should she allow her to have such privileges if she does not do well in school and does not attend her classes." Isabella asked Shakira: "'Why do you even want me back if you don't care about me?'" She told Shakira to "stop trying to get her back and stated 'I don't ever want to come back home. If that happens, I will run away or I would rather die.'" Isabella "began

___

and accommodations that will be provided' to the child." (*In re Juan A.* (2024) 106 Cal.App.5th 1204, 1211, fn. 11.)

to berate her mother and used inappropriate foul language," and the social worker ended the visit. Isabella threw a napkin at Shakira and walked out. Because the relationship between Shakira and Isabella remained acrimonious, the juvenile court could reasonably conclude it was not yet safe to return Isabella to Shakira's custody.

C. *Substantial Evidence Supported the Juvenile Court's Finding the Department Provided Reasonable Reunification Services*

To "support a finding that services were reasonable, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.'" (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 625, fn. 6; see *B.D. v. Superior Court* (2025) 110 Cal.App.5th 1132, 1151; *In re A.G.* (2017) 12 Cal.App.5th 994, 1001.)

Substantial evidence supported the juvenile court's finding by clear and convincing evidence the Department provided reasonable reunification services. Social workers communicated with Shakira, Isabella, Isabella's caregiver, her school principal, and Isabella's and Shakira's therapists. The Department referred Isabella to mental health services and referred Shakira to parenting classes. Social workers also monitored visits between Shakira and Isabella.

Shakira argues the Department should have done more to facilitate conjoint therapy with Isabella. At disposition the

9

juvenile court ordered conjoint counseling if Isabella's therapist recommended it. (*Isabella M. I*, *supra*, B342827.) As of the six-month review, however, Isabella had not yet established a relationship with a therapist. In addition, though Isabella at times said she wanted to participate in conjoint therapy, each time she changed her mind. Shakira contends "a child should not have sole control over whether conjoint therapy takes place," but the Department tried to facilitate conjoint therapy, as well as individual therapy, for Isabella.[3] When Isabella told the social worker on April 10, 2025 she wanted to see Shakira and wanted family therapy, the social worker offered her a visit with Shakira that day, but Isabella declined. That same day the supervising social worker contacted Isabella's therapist and left a voicemail message stating, "Isabella has stated that she may want conjoint sessions with her mother." However, when Isabella and Shakira's visit the next day went poorly, Isabella said that she did not want therapy with her mother and that she only wanted "therapy for herself to 'find closure.'"

Shakira does not suggest what more the Department should have done to persuade Isabella to participate in conjoint therapy.[4] (Cf. *In re Alvin R.* (2003) 108 Cal.App.4th 962, 972

---

[3] For example, when Isabella refused recommended psychiatric care, the Department obtained an order from the juvenile court requiring Isabella to participate in psychiatric services.

[4] Shakira states the Department did not consider using a therapist other than Isabella's therapist to provide conjoint counseling, but she does not explain how identifying a different therapist would have overcome Isabella's unwillingness to participate in therapy.

[child protective agency did not provide reasonable services where its report "did not even address its efforts to get [the child] into counseling"].)  In addition, given the hostile relationship between Shakira and Isabella, it was unlikely conjoint therapy would have been productive until each of them made progress in individual therapy.  The Department did not have to force Isabella to participate in conjoint therapy before she was ready. (See *In re A.O., supra,* 111 Cal.App.5th at p. 1062 [where "'the minor is reluctant to visit, and family therapy is needed to promote visitation, such therapy may be critical to reunification,'" but the juvenile court must consider "'the "possibility of adverse psychological consequences of an unwanted visit between mother and child"'"]; see also *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356 ["'the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation'"].)

Shakira also argues that, when she requested referrals for parenting classes, the Department "sent an email with two service providers."  She cites *In re Taylor J.* (2014) 223 Cal.App.4th 1446 at page 1452, where the court stated "reunification services are not 'reasonable' if they consist of nothing more than handing the parent a list of counseling agencies when the list contained the name of only one domestic violence victim counseling agency in proximity to [the parent's] home."  But Shakira does not contend that the two service providers the Department suggested were inappropriate or that the Department's efforts consisted of nothing more than the referral.  Similarly, Shakira asserts that her assigned social worker went on leave and that the supervising social worker who wrote the six-month status review report did not speak to

11

Shakira about her "perception of her needs."  Shakira, however, does not explain how that omission could have prevented her from reunifying with Isabella.  The juvenile court reasonably concluded by clear and convincing evidence the Department provided reasonable reunification services.

## DISPOSITION

The order is affirmed.

SEGAL, J.

We concur:

MARTINEZ, P. J.

STONE, J.