Filed 5/8/25  In re C.A. CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.A., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E084813 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1301043) |
| v. | OPINION |
| J.A., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mona M. Nemat, Judge. Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, and Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

1

In this dependency appeal, the father challenges juvenile court jurisdictional and dispositional orders. In his view, there was insufficient evidence to support the trial court findings of domestic violence between mother and father, substance abuse by father, and that the child faced a substantial risk of physical harm in father's care. We disagree and affirm.

BACKGROUND

Father has been in a relationship with mother for about 20 years. C.A. (born 2007) is their only child together and father's only child. When this dependency started, the child was a junior in high school and lived with his mother and father in a short-term rental.

A previous dependency with the same parties was based on sustained allegations of domestic violence. The child, six years old when the dependency started in 2013, told the department that mother either threw a plate at father or pushed him, and father reacted by pulling her hair, throwing her to the ground, and choking her. The child tried to intervene, but father grabbed his left wrist and threw him into a chair. Father claimed he and mother were only yelling until she initiated physical violence by biting his arm. The dependency lasted from September 2013 to July 2014, and ended with the child returned to his parents.

In 2013, the department received another domestic violence allegation but determined it was unfounded after the department lost contact with the family. At the time, mother had a no contact restraining order against father. However, despite father

2

violating this order, mother had it downgraded it to a no negative contact order sometime between 2023 and 2024.

Father has a criminal record, with convictions for infliction of corporal injury on a spouse, felony assault, and violating a stay away order.

In June 2024, police arrested father after receiving a report that father was hitting mother in a car. Officers found both parents were drunk, and father was driving the car. Both parents said they were going to the liquor store to get more alcohol, and that on the way the other party began to get aggressive—with father saying mother " 'went a little crazy on me' " and mother reporting father " 'flipped out.' " According to mother, father took her phone and threw it out of the car before punching her in the eye multiple times. When he pulled over, he grabbed her so she could not leave, and she screamed for help until a bystander was able to separate them. Father said mother began to yell at him, so he pulled over and told her to get out, at which point she hit and scratched him. Father had a laceration on his right wrist when arrested, and mother had two large bruises under her eyes when a social worker visited her a few days later.

The same month, the department initiated this dependency after receiving a report the child was being neglected and emotionally abused. The department spoke to the child, who said he did not know what happened between his parents, but after seeing his mother's bruises "put two and two together." He denied that his parents ever fought in front of him or that the fighting ever affected him. He said both parents drink, but that mother cut back recently and father never drinks and drives with the child in the car. He

3

said he did not remember the last time he saw mother drunk and that when father drinks he is "mellow."

The department also questioned mother, who told them that police had been called for arguments between her and father " 'a thousand times' " and that the child was present for five physical fights between her and father. She said the last time was in 2023, when the department last investigated the family. She said she was not then drunk but drank afterward. She also said father was no longer living with her and the child, and she did not plan to let him return.

A few days after the referral, mother agreed to have the short-term rental host help ensure father was not at the home. The same day, the department went to the home unannounced and found father outside. Father said he was borrowing the child's car, and that mother knew he was there. He refused to provide a home address but told the department it was with a friend in Riverside. He denied substance abuse, including drinking, though he admitted drinking about three to four beers a week. He also said that police were involved in the couples' disputes about six times in twenty years and corroborated mother's account that the last involvement was in 2023. He said the child witnessed some of these fights. Father agreed not to be at the home with the mother.

In July 2024, mother told the department mother had stopped drinking, and father had not been around the family and did not live in the home. The child said the same when the department visited him at school the next month. He also told the department he and mother were still living in the same place. However, after speaking to the child,

4

the department made an unannounced home visit and found that neither C.A. nor mother were living there; they had been gone about a month.

The department called father, who sounded intoxicated but denied having contact with mother or the child. He also said he knew only that they were living with a friend of mother's in Riverside. He also admitted to drinking beer, and said the last time he drank was the night before when he had two beers.

The department was unable to contact mother or the child until visiting the child's school on August 19, 2024. He refused to speak to the department except to say he felt safe at home. The same day, the department discovered mother had been arrested and incarcerated three days earlier for assault with a deadly weapon. When the department contacted father, he said the child was fine and was staying with a friend. Father claimed mother was arrested for defending him against someone else, not for fighting with him. He refused to provide contact information for the child and insisted it was illegal for the department to speak to the child.

On August 22, 2024, the department met with mother, who confirmed the child was staying with a family friend whose name mother provided. Mother claimed not to know the address. Mother said she was arrested for an altercation with their short-term rental host, denied that it was domestic violence or alcohol related, and denied seeing or speaking to father. Mother agreed to a drug test and a safety plan. The drug test was positive for ethyl glucuronide and ethyl sulfate.

5

On August 23, 2024 the department met with the family friend who was housing the child. She said he was welcome to stay as long as he would like and that she would cooperate with the department as a part of the family's safety network. She said that in the past the child would sometimes reach out to stay with them "when things were not well in his home." Mother never reached out herself, but the family friend would always try to confirm that it was ok for the child to stay there. These stays were getting longer, but she never had any issues with him being in her home, saying he was "very smart and responsible and she would do what she could to be there for him." She said she had not seen mother and father together, but that father "dropped all of the child's stuff off . . . at the house and then left without addressing" the family friend at all.

On August 27, 2024, the child told the department "he wanted stability and did not want his mother or father to take him if they did not have everything settled." He was particularly concerned "they would take him and not allow him to finish his school year." He refused to speak about his parents any further other than to say he was afraid his mother would feel betrayed if he did not want to go with her. Later that day mother told the family friend she wanted to pick up the child. The department reminded mother that she agreed to let the child stay at the friend's house as part of the safety plan, but mother denied ever agreeing to that. At 9:00 p.m. the same day, the family friend called the police alleging mother attempted to break into her home. The next day the child was placed in protective custody.

On August 30, 2024, the department filed a petition under Welfare and Institutions Code[1] section 300, subdivision (b). The petition alleged both parents have a history of domestic violence, a history of abusing alcohol, and a history with the department because of these unresolved issues. The petition further alleged that father has a criminal history, and that mother had unresolved mental health issues.

The court held a detention hearing in September 2024. It found the department made a prima facie case and removed the child from both parents. The child was then placed with his maternal aunt.

The department re-interviewed both parents and the child in September 2024. The child denied ever witnessing altercations between his parents, denied that his parents had alcohol issues, denied that his father had a criminal record, and denied that his mother had mental health issues. He said that "the parent's actions no longer affect him." At the time, the child was a high school senior with a 4.0 GPA and planned to attend Oregon State. According to the department, he "presents a mature attitude," and was "well-spoken, bright, polite, and highly intelligent."

Father denied every allegation in the petition except the allegation that mother abuses alcohol. He claimed that all previous domestic violence allegations were false, that the charges against him were dropped, and that the latest charges would also be dropped. Mother admitted that she and father have a history of domestic violence. However, she said she was not the aggressor in the most recent incident and the child

---

[1] Unlabeled statutory citations refer to the Welfare and Institutions Code.

7

never witnessed any of the altercations.  She admitted that she had a history of alcohol abuse but claimed she no longer abused alcohol and was attending AA meetings.  Mother denied all other allegations.

The department amended the petition in October 2024 to remove the allegation that mother suffered from unresolved mental health issues.

The court held a contested jurisdiction and disposition hearing on October 8, 2024.  The department asked the court to find the amended petition true and grant the parents reunification services.  Minor's counsel and mother both submitted on the petition and the department's recommendation.  Father argued the department had not proven he had a substance abuse problem, and that the allegation regarding his criminal history duplicated the allegation about domestic violence.  The court modified the substance abuse allegation against father to allege only that father uses—not abuses—alcohol and becomes aggressive when he does so.  With that modification, the court found the allegations true, determined C.A. fell within section 300, and ordered family reunification services.

ANALYSIS

*A.  Justiciability*

The department argues we should dismiss father's appeal because he does not contest the jurisdictional findings against mother and conceded the jurisdictional findings against himself.  Father argues that because he is also appealing the court's dispositional

8

orders—which are based on its jurisdictional findings—we can and should review those jurisdictional findings here. We agree with father.

The department "is not required to prove two petitions, one against [one parent] and one against the [other parent], in order for the court to properly sustain a petition or adjudicate a dependency." (*In re La Shonda B.* (1979) 95 Cal.App.3d 593, 599.) As such, "a jurisdictional finding good against one parent is good against both." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) For that reason, "an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence," because no matter the outcome, the juvenile court will retain jurisdiction against both parents. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.)

However, "we generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.) Here, because father challenges both the jurisdictional and dispositional orders, and the jurisdictional finding against him " ' "could potentially impact the current or future dependency proceedings," ' " we exercise our discretion to review the merits of his appeal. (*In re*

9

*L.O.* (2021) 67 Cal.App.5th 227, 237-238, quoting *In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.)

Moreover, we disagree with the department's claim that father conceded any of the allegations against him. Before the contested jurisdiction/disposition hearing, father denied every allegation except an allegation against mother. At the hearing, his counsel stated that he "continue[d] with [the] denials," before asking to be heard. Counsel then contested the evidence supporting some of the allegations. Father did not expressly argue against each allegation, but that does not mean that he was conceding the allegations he did not argue. Nor did he abandon his arguments, since his counsel was clear that father continued to deny them all.

Accordingly, we find it appropriate to consider whether substantial evidence supported the trial court's true findings as to the contested allegations against father.

*B. Jurisdiction*

A juvenile court may take jurisdiction of a child under section 300, subdivision (b)(1), only if it finds by a preponderance of evidence that the " 'child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child.' " The social service agency bears the burden to demonstrate the following three elements: "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

10

" 'The basic question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' " (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022, italics added.)  "Jurisdiction 'may not be based on a single episode of endangering conduct in the absence of evidence that such conduct is likely to reoccur.' " (*In re C.V.* (2017) 15 Cal.App.5th 566, 572.)  However, "[t]he court may consider past events in deciding whether a child presently needs the court's protection. [Citations.]  A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602 (*Cole L.*).)

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]  ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' [Citations.]" ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

11

Father contests only the juvenile court's findings as to allegation b-1, that the parents had a history of domestic violence incidents and father in particular had a criminal history related to domestic violence, and b-3, that father "has an unresolved history of using alcohol and when he is under the influence, father has a history of becoming aggressive."

We find sufficient evidence for a true finding on each of these allegations. As to allegation b-1, although father denies any domestic violence between him and mother, mother admitted there was. Indeed, mother said throughout the dependency that domestic violence incidents were common between her and father. She told the department police got involved in fights between her and father " 'a thousand times' " and C.A. was present for at least five physical fights between the parents. Father's later denials also contradict his earlier statements to the department. For instance, in June 2024, father told the department that police "had been called for arguments or disputes about six times in the twenty years they have been together." Thus, both parents have at various times admitted to being involved in domestic abuse. The trial court could reasonably find father's later denials were not credible.

The record also documents domestic violence between the parents with the child present. The 2013 dependency began because the child was present for and injured in a fight between mother and father. Father denies that happened, but those allegations were sustained, and the juvenile court is permitted to find father's denial not credible. This alone suffices to establish a history of domestic violence endangering the child.

12

In addition to that dependency, the incident that started this dependency provides evidence mother and father were violent towards each other. Mother sustained two black eyes, which the department observed and which the child assumed came from a fight with father. Father told police and the department that mother attacked him, and he had a wound to prove it. That was sufficient for the court to conclude father had abused mother in the most recent incident, along with his history of doing so.

Second, sufficient evidence supported the trial court's conclusion that father uses alcohol and then becomes aggressive. The police reported that he and mother were drunk during the incident which started this dependency, and father said he continued to drink throughout the dependency. Mother and father were also drunk during the 2013 domestic violence incident. This is ample evidence the parents' aggression towards each other is connected to their drinking, more than enough to sustain the allegation father uses alcohol and becomes aggressive when he does so.

Finally, we disagree with father that there is no current risk of physical harm to the child. The parents' long, well-documented, and extensive history of domestic violence, as well as their continued refusal to do anything about it, suggests that there is a risk they will engage in domestic violence again, which may endanger the child. Domestic violence in the presence of a child is inherently dangerous, and in the past the child was in fact physically abused during such incidents. Mother also obtained a no contact restraining order against father at one point, and though she later had it reduced to a no negative contact order, nothing suggests that the relationship had changed. In addition,

13

mother and father have been evasive about where they are living, whether they are living together, and whether they are still in contact. At one point, the department found father outside the family home, despite being told he was not to have contact with mother or the child. Mother also initially lied about where she and the child were living, saying they were both still at their previous rental when in fact they had moved out, which the department discovered a month later. The family friend with whom the child was staying told the department she only ever had contact with mother, but that father was the one who dropped things off for the child. This suggests mother and father were in touch with each other and coordinating about the child's whereabouts. As late as September 2024, father reported that he resided "off-and-on with the mother at their common address." Moreover, mother was arrested for assault with a deadly weapon, and father told the department it was because she was defending him. Thus, there is substantial evidence mother and father are still in contact with one another, at the very least, and engaging in violent conduct with each other and others.

In support of a different conclusion, father relies on *Cole L.*, *supra,* 70 Cal.App.5th 591. In that case, police responded to a domestic violence incident that occurred while the participants' children were asleep in other rooms. (*Id.* at pp. 595-596, 604.) The court found insufficient evidence to support jurisdiction because the alleged incident happened away from the children and the parents had no history of domestic violence. In addition, the mother took affirmative steps to ensure that father would not be allowed back in the house, that she would not have contact with him, and that he would

14

not have access to the children, thereby alleviating concerns of ongoing domestic violence. (*Cole L.*, at pp. 607-608.)

Here, in contrast, there *is* a history of domestic violence between the parents, and it appears that neither parent has taken steps to prevent further domestic violence. The only similarity between *Cole L.* and this case is that the incident that started the dependency proceedings happened away from any children. But this was not the dispositive fact in *Cole L.*, where *"*the juvenile court did not find that single incident alone created a substantial risk of serious physical harm to [the children.]" (*Cole L.*, *supra*, at p. 604.) Instead, *Cole L.* criticized the juvenile court for "relying instead on the 'long history of these parents having some domestic violence issues,'" despite there being "no evidence in the record that [the parents] had engaged in multiple acts of domestic violence over an extended time." (*Id.* at pp. 604, 605.) In other words, *Cole L.* did not object to using a history of domestic violence to find jurisdiction over affected minors even where the minors were not present for the violence. It noted only that the parents in *Cole L.* had no such history. That is not the case here.

The record contains sufficient evidence to conclude that the child faces a present risk of physical harm due to his parents' ongoing domestic violence, and therefore that the court properly took jurisdiction under section 300, subdivision (b).

*C. Substantial Evidence Supports the Removal Order*

Father argues that even if the jurisdiction findings are supported by substantial evidence, the court's order removing the child from his custody was not.

"Before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. [Citations.] The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home. [Citations.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citations.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-136.) In making these findings "the court may consider the parent's past conduct as well as present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) "We review the court's dispositional findings for substantial evidence." (*In re T.V., supra,* at p. 136.)

Substantial evidence supported the trial court's decision to remove this child from father's custody. Much of the evidence supporting jurisdiction, discussed above, also supports removal. The child has repeatedly been exposed to domestic violence, his parents do not seem to understand the risk this poses to him, and do not plan to separate or otherwise remedy this threat. The parents may still be living together, there is strong evidence they are still in contact, and allegedly violently fought even during this dependency. Father continued to drink throughout the dependency and sounded intoxicated on the phone when talking to the department at least once.

Thus, there was more than sufficient evidence to allow the juvenile court to conclude that father (and mother) did not fully appreciate the risk their behavior posed to

16

the child, there was no sign of either parent correcting that behavior, and restraining

orders would not protect the child.  Accordingly, we affirm the trial court's jurisdiction

and disposition orders.

DISPOSITION

We affirm.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL_____
J.

We concur:


McKINSTER_____
   Acting P. J.

CODRINGTON_____
     J.