Filed 6/24/26  In re D.L. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re D.L., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br>v.<br>H.M.,<br><br>    Defendant and Appellant. | A174221<br><br>(Alameda County Super. Ct. No. JD03951401) |

The juvenile court sustained allegations that H.M. (mother) failed to protect her adolescent daughter, D.L., from sexual abuse by an adult uncle and a male cousin with whom they resided.  At the disposition hearing it removed D.L. from mother's custody and ordered reunification services.  Mother now appeals the disposition order.  Subsequently, while this appeal was pending, D.L. was returned to mother's custody after mother successfully participated in nearly four months of reunification services.

On appeal from the disposition order, mother does not contest the exercise of jurisdiction.  She argues only that her daughter should not have been removed from her physical custody at the disposition hearing because

1

there is no substantial evidence measured by clear and convincing evidence to support that decision. The Alameda County Social Services Agency (Agency) contends that because D.L. has been returned to mother's custody this appeal is now moot. We disagree. We therefore address the appeal on the merits and conclude that the trial court's decision removing D.L. was not supported by substantial evidence.

## BACKGROUND

D.L. was taken into protective custody by police on May 29, 2025, when she was 14 and one-half years old, after disclosing (to an unspecified source) that one of her maternal uncles, H.L.M., with whom she and mother resided, had inserted his penis into her vagina.

Three years earlier, in August 2022, the Agency had substantiated an allegation that another maternal uncle, A.L.M., had sexually abused D.L. more than once in mother's home while mother was away at work (he would put his penis into her vagina). That uncle was subsequently arrested, and the referral was closed. According to both the detention report and the jurisdiction/disposition report in this case, "mother was protective at that time and the child could remain safely in the care of the mother, as the mother did not allow any other males in the home." The latter report states that the emergency response social worker "was able to create a Safety Plan with [mother] that completely prohibited [A.L.M.] from accessing the home, which then allowed for the closure of the referral."[1]

At the time D.L. was taken into protective custody based on the revelations about H.L.M., she and mother were living in Fremont, California

---

[1] At the time of these proceedings, A.L.M. was incarcerated but the record is unclear as to whether this was due to a conviction on sexual abuse charges stemming from the 2022 incident or due to other, unrelated charges.

2

in a household with, by our count, at least six other people: H.L.M.; another maternal uncle, Santos, who shared a bedroom with H.L.M; Santos' best friend who slept in the living room; D.L.'s cousin, E.L.G., who is H.L.M's son; and D.L.'s two other cousins (mother's nieces), Olga and Wendy. Mother was working an unspecified job, weekdays from 4:30 p.m. to 11:30 p.m., and Sunday mornings.[2] Mother's preferred language is Spanish, and throughout this case she was interviewed and participated in proceedings with the assistance of a Spanish language interpreter.

In D.L.'s CALICO interview conducted the day she was taken into protective custody over her revelations about H.L.M., D.L. disclosed that some of the other family members with whom they lived or who spent time at their home had also touched her inappropriately or made sexually suggestive comments: her uncle Santos, who once told her she was "only good for sex," another uncle, C.L., who once came into her bedroom and tried to sexually assault her before she was able to escape to another bedroom[3], and her cousin E.LG., who she said had tried to put his penis inside her many years earlier when they were living in Guatemala. She said her mother had been made aware of all these incidents and had told her to sleep in her cousin Olga's room at night when mother wasn't home.

The following day, H.L.M. was arrested. He denied D.L.'s allegations. According to the detention report, the investigating detective found him "quite credible." The detective told an emergency response worker that D.L. "has had a lot of trauma (past sexual abuse, etc.)" and concluded, based on

---

[2] D.L.'s father lived in Guatemala, had not been in D.L.'s life since her infancy, and his whereabouts were unknown.

[3] It is unclear if C.L. lived in the same household.

3

his interview with D.L., that "it seems that she may have made up the current allegations" because "it appears she may be upset with [the uncle] about having to complete chores at home and knows what will happen in a sexual abuse investigation, and so [may have] used this to her advantage."

An emergency response social worker also spoke with mother, who said she would need to look for a safe place to live with D.L. to be away from H.L.M. Mother told the emergency response social worker that about a month earlier, D.L. had told her that H.L.M. wanted to be sexual with her but had "stopped," and that when mother had asked if H.L.M. had touched her, D.L. said " 'no, everything is good.' " Mother said she had told D.L. to " '[t]ell me the truth. You are safe with me.' " She also said she had confronted H.L.M. and he had denied having acted inappropriately. Mother told the emergency response social worker that "D.L. has always lied in the past and [mother] indicated frustration." In a follow-up interview, mother explained she had returned home from work to find D.L. gone, and that when D.L. returned she told mother she had left home because H.L.M. had tried to " 'touch' " her. Mother acknowledged that she didn't do anything further such as call police but said she did instruct D.L. that if it happened again while she wasn't home to call the police immediately.

She also said in the follow-up interview that D.L. had never told her about the incident with D.L.'s cousin, E.L.G. All mother knew was that once when D.L. and E.L.G. were playing together while mother was away and the two were being watched by their older cousin Wendy, they began fighting. When pressed as to why mother still allowed E.L.G. to have unrestricted access to D.L., mother said " 'I don't know what to say.' " When pressed as to why mother had not moved out of the home she and D.L. shared with their other relatives and allowed them to have unrestricted access to D.L., mother

4

again indicated she did not know what to say but that she had told D.L.to call the police if anything happened while mother was not home.

The Agency initiated this case, and D.L. was ordered detained and placed with a foster family. At the time of the detention hearing, D.L. missed her mother and wanted to return home. Mother's counsel did not contest the detention recommendation only because mother could not immediately find someplace else to live. At a child and family team meeting held the same day (June 3), mother again indicated her willingness to move out of the home to protect D.L. and prohibit other adults from living with them. The Agency reported that, "[w]hile [mother] relocates [the] team agreed [at this meeting] that until [mother] is able to move into a new place it is safest for [D.L.] to remain in protective custody."

Two weeks later, at a meeting held on June 16, mother reported she had found a room to move into the following month, despite difficulties her immigration status had posed to finding new housing. At a meeting held on June 23, mother "reported that she does not know what her family needs other than to stay away from her brothers." By this point, D.L. was happy to be out of the family home away from her uncles but still missed mother. Her caregivers reported a consistent decline in her mental health.

By the time of the combined jurisdiction/disposition hearing held on August 14, 2025, mother had moved into the new room. She also had completed five or six parenting classes. She had not yet begun individual therapy only because the Agency was having difficulty finding her a Spanish-speaking therapist.

At the hearing, the juvenile court adjudged D.L. a dependent on the grounds that mother had failed to protect her from sexual abuse by her uncle

5

and cousin (Welf. & Inst. Code,[4] § 300, subds. (b)(1) and (d)), and her father, whose whereabouts were unknown, had left her without care and support (§ 300, subd. (g)). Mother did not contest the jurisdictional allegations and does not challenge them here.[5]

At the contested disposition phase of the hearing, the case worker testified very briefly.

She did not testify that mother's new home environment would be unsafe or in any way unsuitable for D.L. She testified it was a rented room in an apartment located about a mile to a mile and a half away from mother's former household. She did not know how many bedrooms or bathrooms the apartment had. Mother had told her that the family who lived there was a family of three, a father, mother and son. The case worker testified she was

---

[4] All further statutory citations are to the Welfare and Institutions Code unless otherwise indicated.

[5] Specifically, the juvenile court found true allegations that "[D.L.] (age 14.5) has been sexually touched on more than one occasion by her maternal uncle, [H.L.M.], who resides in the family home, in that he pulled down her pants and inserted his penis tip into her vagina and attempted to do so on another occasion while she was sleeping. [H.L.M.] told [D.L.] that he was sorry and that he would be 'arrested' if the abuse was found out." It also found true allegations that "[D.L.] was sexually touched by her cousin, [E.L.G.] (he placed his penis on her leg) who resides in the family home with her currently, when the two of them lived in Guatemala at least two years prior." And it found true allegations that mother "was made aware that [D.L.] (age 14.5) has been sexually touched by . . . maternal uncle [H.L.M.] and cousin [E.L.G.], who currently reside in the family's shared household and [mother] allowed those adults unrestricted access to [D.L.] despite knowing that she had been encountered with sexual propositions and touching at least one time in the past year. The mother is unsure of [D.L.'s] credibility in regards to the ongoing sexual abuse and [D.L.] is at risk of suffering significant injury or illness as a result."

concerned about D.L. going to live there because mother did not know the ages of the father and son who lived there.

Mother worked from 4:30 p.m. to 11:30 p.m. and on Sunday mornings. The case worker had not formally discussed a safety plan with mother, but they had discussed how D.L. would be cared for in the new rented room while mother was away at work. Mother told the case worker that D.L. would stay in their room and not interact with the family who lived in the apartment when mother was not there. The room D.L. would occupy had a door but not a lock. The case worker had not asked mother about installing one.

The case worker had not formulated a proposed safety plan for mother or engaged her in a formal safety plan discussion. She testified she had attempted to have such a discussion with mother in one of their child and family team meetings in which mother participated with a Spanish interpreter. In the case worker's view, the attempt was "unsuccessful" because mother "was giving really short one word answers and not, you know, really engaging" and also because when mother was asked who her support network was, could only name one person—her 18-year-old niece, Olga.[6]

The case worker testified she had the sense that perhaps the formality of that meeting setting "brought up a little too much" for mother, and so she tried to have a more informal discussion around safety planning with mother "[a]nd we still kind of didn't get anywhere." She testified she had not had a fuller safety planning discussion with mother at that juncture "[b]ecause at the time [mother] had not, I guess, thought about how things would be after

---

[6] The jurisdiction/disposition report, prepared more than a month earlier, stated that mother had reported *both* of her nieces, Wendy and Olga, "as her network of support."

[D.L.] got home. [¶] It was more so like, okay, get her home and we will make it work after that." However, the case worker acknowledged on cross-examination that crafting a safety plan entails a collaborative effort between the Agency and a parent, and that the parent is not expected to just propose one on their own. The case worker did not testify that she had proposed any specific elements of a safety plan or that mother was unwilling or unable to abide by any proposed plan to keep D.L. away from her uncle and cousin.

The case worker testified she had concerns about mother's "protective capacity." She was concerned because (1) mother "has had inconsistencies on whether she knew about the abuse or not since the day the case began"; (2) when D.L. told mother about the most recent incidents, mother had told D.L. to call the police if anything happened again[7]; (3) "abuse has been minimized for a long time, in this family"; (4) mother reportedly knew about the most recent incidents of sexual abuse yet when she was at work allowed men in the home to have unrestricted access to D.L. anyway; and (5) three years earlier when the allegations about D.L.'s other uncle came to light, mother had reportedly "called a family meeting in the living room with the perpetrator and the victim and asked the perpetrator in front of the victim if he did it."

The case worker also testified that D.L. had previously told her she wasn't "ready to return home" but had recently changed her mind.[8]

---

[7] The jurisdiction/disposition report characterized this as a *strength* not a criticism. (See footnote 133, *post,* page 16.)

[8] In the Agency's most recent report, i.e., the jurisdiction/disposition report prepared about a month and a half earlier which was before mother had moved to the new apartment, the social worker reported speaking with D.L. who said she missed mother, her cousin Olga and her home but was happy not to be living there with her uncles.

At the conclusion of the contested disposition phase of the hearing, and after hearing argument, the court declined to return D.L. to mother's custody and ordered reunification services. It expressed concerns that D.L. had been subjected to "serial abuse," no safety plan had been devised ("And yes, it doesn't just lie on mom, but . . . [¶] . . . I don't accept the 'let's see what happens,' approach to this"), and the lack of any information "to assess who lives in that apartment." It also expressed concern about D.L.'s solemn affect at the hearing, as well as the fact that D.L. had refused to speak confidentially to the court about her preference for placement. The juvenile court said it was "confident" the family would reunify and granted the Agency discretion to allow unsupervised visits as well as overnight visits on five days' notice. This timely appeal followed.

## DISCUSSION

### I.

### *Mootness*

On December 9, 2025, nearly four months after the contested disposition hearing, D.L. was returned to mother's custody with an order for family maintenance services. The parties disagree as to whether, as a result, mother's appeal of the order removing D.L. from parental custody is now moot. We agree with mother that it is not.

An appeal is not moot when a party has identified a "tangible legal or practical consequence" of the challenged ruling "that would be remedied by a favorable decision on appeal" (*In re D.P.* (2023) 14 Cal.5th 266, 278), and that is the case here. Although there would be no practical consequence of deciding whether the juvenile court erred when it declined to return D.L. to mother at the disposition hearing, mother has articulated a specific legal consequence. She argues that if we reverse the disposition order, legally the

9

time limitations for her to reunify with D.L. would not have been triggered and instead she would be entitled to indefinite family maintenance services.

We agree. The Agency concedes that mother *would be* "subject to the reunification timelines" if D.L. is subsequently removed from her custody again. Neither party has spelled out precisely how such time limitations would apply in this case if D.L. were removed from mother's custody a second time while the case remains pending. But, as next explained, we conclude pursuant to the applicable statutes that if the disposition order is *not* reversed and D.L. is subsequently removed from mother's custody again, mother's presumptive right to 12 months of reunification services will expire on August 2, 2026. By contrast, if the disposition order *is* reversed, that 12-month deadline will not be triggered unless and until there is a second order removing D.L. from her custody.

As matters now stand, unless D.L. is removed from mother's custody a second time, mother is not subject to any applicable deadlines. This is because when a juvenile court maintains supervision over a child who remains at home with family maintenance services, the court reviews the child's status every six months under section 364. (See §§ 364, 16506.) That provision applies both to dependent children who were never removed from parental custody and to those who were removed but then returned to parental custody with an order for family maintenance services. (*In re N.O.* (2019) 31 Cal.App.5th 899, 903, 922.) "At the section 364 review hearing, the juvenile court is not concerned with reunification, but in determining whether the dependency should be terminated or [continued] supervision is necessary." (*Id.* at p. 922.) "Unlike family reunification services, nothing in the Welfare and Institutions Code or the California Rules of Court limits the time period for court supervision and services for dependent minors who

10

remain at home, so family maintenance services may be provided until the dependent minor reaches the age of majority." (*Id.* at p. 922, fn. 7.) So currently, mother is entitled to indefinite family maintenance services until D.L. turns 18 unless either the court terminates its jurisdiction sooner or mother loses physical custody of D.L. again.

However, generally, when a child is removed from parental custody, family reunification services are provided and the period of time to reunify is statutorily limited by section 361.5. Subdivision (a) provides for two different periods of reunification services depending on a child's age. For a child who, like D.L., was three years old or older when initially removed from her parent's physical custody, reunification services are provided beginning on the date of the dispositional hearing and end 12 months (with possible extensions[9]) after the child was placed in foster care (as statutorily defined) unless the child is returned to the home of the parent or guardian. For children removed at a younger age, shorter deadlines apply.[10]

Even if physical custody of the child is returned to the parent before the 12-month period ends, that does not operate to toll the 12-month period. (§ 361.5, subd. (a)(3)(B).) As result, if the disposition order removing D.L.

[9] (§ 361.5, subd. (a)(1)(A); see also § 361.49.) In some cases, services may be further extended up to a maximum period of 24 months "after the date the child was originally removed from physical custody" of a parent. (See § 361.5, subd. (a)(3)(A) [18 months if court finds "a substantial probability" child will be returned to parent within the extended time or reasonable services have not been provided]; *id.*, subd. (a)(4)(A) [24 months if court finds it is in child's best interest to have time period extended and there is substantial probability child will be returned to parent who is described in subdivision (b) of section 366.22 within extended time period or reasonable services have not been provided].)

[10] A shorter period applies to children who are under three years of age on the date of initial removal. (§ 361.5, subd. (a)(1)(B).)

from mother's care is affirmed, in the unfortunate event that D.L. was again removed from mother's custody, the period for reunification would run from the date of the disposition hearing (held on August 14, 2025) and would not be tolled after any return to her mother's custody. (§ 361.5. subd. (a)(1)(A), (a)(3)(B).) Unless the court further extended it, the period (see footnote 9, *ante*, page 11) would end on August 2, 2026, 12 months after she would be deemed to have entered foster care in this scenario. (See § 361.49, subd.(a).)[11]

On the other hand, if the initial dispositional order removing D.L. from mother's custody is reversed and, based on new circumstances, the court removed her from custody at a future date during the dependency proceeding, the outcome would be more favorable to mother and D.L. Specifically, by operation of section 361.49, subdivision (b), if a child is retained by the parent at disposition and the court subsequently removes the child, the end date for the 12-month reunification period under section 361.5, subdivision (a) is the earlier of the jurisdictional hearing on the motion to remove the child or

---

[11] She would be deemed to have entered foster care on August 2, 2025, if we affirmed the disposition order, a date we calculated as follows. In that scenario, D.L. would be subject to subdivision (a) of section 361.49. It provides that a child is deemed to have entered foster care "on the earlier of the date of the jurisdictional hearing," which in this case took place on August 14, 2025, or "60 days after the date on which the child was initially removed from the physical custody of their parent or guardian" (§ 361.49, subd. (a); see also *In re Damian L.* (2023) 90 Cal.App.5th 357, 373 ["a child's initial or original removal occurs at the time a child's removal is ordered at a detention hearing"]), which in this case is 60 days after D.L. was detained on June 3, 2025, or August 2, 2025. Thus, the earlier of those dates, August 2, 2025, is the date D.L. would be deemed to have entered foster care. As discussed in the text, *post*, a different foster care entry date would apply if the disposition order is reversed.

60 days after removal. (See § 361.49, subd. (b) [defining date of entry into foster care "[w]hen the court orders the custody of a child to be retained by the parent or guardian at disposition, even if the child was initially detained, and then subsequently removes the child at disposition on a petition brought under Section 342 or 387"].) Therefore, if we reverse the disposition order mother initially will have retained custody of D.L. and be subject to this provision. Thus, if D.L. were removed from mother in the future, she and D.L. would have a longer period remaining to receive 12 months of reunification services and to reunify. In this way they would be in a more favorable position if the removal of D.L. at the inception of these proceedings is reversed than they will be if we dismiss the appeal as moot.

That is a legal consequence that is redressable by a favorable ruling reversing the disposition order. If we conclude the initial removal was erroneous, mother would be entitled to a full round of reunification services if D.L. were to be again removed from mother's custody, unfettered by the reunification clock that already began ticking.

The Agency tacitly concedes this. It acknowledges that "the time limits under . . . § 361.49(a) [governing entry into foster care] would . . . re-apply if a subsequent removal occurs under . . . § 387." The conclusion that it draws from this, however, is that "the premise of Mother's argument has been overtaken by events" and "cannot supply a basis for effective relief." That conclusion is unexplained and does not follow.

We conclude that this appeal is not moot, and that even if the return of D.L. to mother's custody did render it moot, the potential collateral consequences to mother and D.L. would merit our exercising discretion to decide it on the merits. (See *In re C.V.* (2017) 15 Cal.App.5th 566, 571 [in light of possible prejudice to parents from juvenile court's finding of

13

jurisdiction in subsequent family law or dependency proceedings, court declined to dismiss appeal as moot]; *In re C.C.* (2009) 172 Cal.App.4th 1481, 1483 [to avoid possible collateral prejudice to mother from order, court would decide appeal on merits].)

## II.

### *The Merits*

#### A.  General Legal Principles

The legal standards for removing a child from parental custody are well-established.  First, as our colleagues in Division Four recently summarized, "[u]nder section 361, subdivision (c)(1), the 'child shall not be taken from the physical custody of their parent[]' unless the court finds clear and convincing evidence of two circumstances.  (§ 361, subd[]. (c) & (c)(1).) The first is that '[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were returned home.'  (§ 361, subd. (c)(1).)  The second is that 'there are no reasonable means by which the [child's] physical health can be protected without removing the [child] from the . . . parent's . . . custody.' (*Ibid.*)  In assessing risk of harm, ' " '[t]he parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' " ' " (*In re L.G.* (2026) 118 Cal.App.5th 1208, 1230, fn. omitted.)

We review the juvenile court's findings under section 361, subdivision (c)(1) for substantial evidence, measured by the higher standard of clear and convincing evidence. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 ["[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains

14

substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof"]; *In re H.B.* (2024) 106 Cal.App.5th 219, 241 [applying *O.B.* in dependency case].) This means we consider " 'whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it *highly probable*' " that the required findings of danger are true. (*In re L.G.*, *supra*, 118 Cal.App.5th at p. 1230, italics added; see also *id.* at pp. 1230-1232 [reversing for lack of such evidence].)

In addition, as we ourselves recently explained, even when there is sufficient evidence by clear and convincing evidence to remove a child from parental custody under the foregoing standards, "the juvenile court may not order a child removed from parental custody without finding that reasonable efforts were made to prevent or eliminate the need for removal." (*In re H.B.*, *supra*, 106 Cal.App.5th at p. 247; § 361, subd. (e).)[12] This required element of proof is reviewed for substantial evidence. (*H.B.,* at p. 241.) "Substantial evidence is evidence that is reasonable, credible, and of solid value. [Citation.] In applying this standard, we 'must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' " (*Ibid.*; see also *id.* at pp. 244-247 [reversing for lack of such proof].)

---

[12] In relevant part, section 361 subdivision (e) states: "The court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from their home . . . . The court shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

On appeal, mother challenges the sufficiency of the evidence concerning both requirements. We agree the Agency did not prove by clear and convincing evidence that there was a substantial danger to D.L. that could not be remedied through any lesser protective measures short of removal. (See *In re L.G., supra,* 118 Cal.App.5th at pp. 1231-1232 [concluding same].) It is therefore unnecessary to address her arguments about the adequacy of the Agency's efforts to prevent or eliminate the need to remove D.L. from her custody.

In assessing whether removal is appropriate, courts must consider a parent's "response to the Agency's intervention and the current circumstances" extant at the time of the contested disposition hearing. (*In re M.V.* (2022) 78 Cal.App.5th 944, 967.) Here, the record shows without contradiction that mother had immediately taken steps to locate and secure new housing—and commendably did so despite what appear to be significant financial and other hardships; cooperated fully with the Agency in every phone call and at every meeting; had participated fully in all the services that had been made available to her to date, consisting of many weeks of parenting classes; and was on a waiting list for therapy. By the standards described in the disposition report (which was prepared nearly two months before the contested hearing took place), she had done everything that had been asked of her to ensure D.L.'s safety and well-being.[13] Further, there is

---

[13] Captioned under the heading "What is Working Well," that June 25, 2025 report had stated: "[mother] has been able to locate a room she and [D.L.] will be able to move into. [Mother] has stated that she is willing to accept services in order to keep [D.L.] safe from harm. [Mother] has named her nieces Wendy . . . and Olga . . . as her support system. [Mother] remains employed and has been able to provide adequate food, shelter and clothing for [D.L.] in the past. [Mother] has instructed [D.L.] to contact the police if she is being harmed by anyone. [D.L.] and her maternal cousin Olga . . . have a

no evidence that mother's new living environment was unsafe for D.L., much less clear and convincing evidence that it was. To the extent the Agency and the juvenile court expressed concerns about that rented room, their concerns were based only on a *lack* of information about who lived there. But that is not substantial evidence of danger. The absence of evidence is not substantial evidence. (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 655.) If it were, "the concept of burden of proof would have no meaning." (*Ibid.*)

As mother persuasively argues, in these circumstances there is not clear and convincing evidence that any residual concerns about mother's protective capacities could not be addressed through other measures. Mother identified two potential support people (see footnote 6, *ante,* page 7)—D.L.'s cousins—one of whom (Olga) had participated in all child and family team meetings and had a very close relationship with D.L.; yet there is no evidence the Agency considered whether Olga or D.L.'s other female cousin could have helped supervise D.L., kept her company while mother worked, and/or dropped by for check-ins to see that she could safely stay fed and to spend time with D.L. outside the confines of the small rented room. Nor does the record disclose why measures such as in-home therapy or unannounced home visits could not have sufficed. Further, there is no evidence that mother had

---

very close relationship. [D.L.] has reported feeling 'better' since being in the home of [foster family] [and] has stated that she is open to therapeutic services and visits with her mother as long as they are not in the mother's home."

Captioned under the heading "What Needs to Happen Next," all the Agency wrote about mother was that she "will move out of the home that her maternal family resides in," "collaborate with the Agency to complete all Case Plan Goals," and "have consistent contact and visits with [D.L.]."

ever violated a court order or that, after she had moved to her new home, she would be unwilling to abide by any safety plan or stay-away orders preventing contact with the offending male relatives.[14] On the contrary, in her most recent conversation with the Agency prior to the hearing (on June 23), she acknowledged that "her family needs . . . to stay away from her brothers," and the only other time she'd been asked to abide by a safety plan to keep her daughter safe (from another uncle, in 2022) it had *worked*: as noted, the jurisdiction/disposition report reported favorably about mother's ability to abide by a safety plan "that completely prohibited [A.L.M.] from accessing the home, which then allowed for the closure of the referral" and said mother had been "protective at that time and the child could remain safely in [her] care." The social worker's criticisms of mother's engagement with safety planning discussions were insubstantial: that mother "was giving really short one word answers and not, you know, really engaging." But mother had engaged: she named two potential support people, neither one of whom the Agency followed up on. Mother was a non-native English speaker who told the Agency she didn't know what else was needed to protect D.L.

---

[14] The social worker's vague testimony that she had a "brief" discussion in which mother indicated she did not wish to pursue a restraining order is not such evidence. The timeframe of that conversation is unclear, mother's reasons were not explored, and the conversation might well have taken place before mother had moved. And regardless, mother's lack of interest in pursuing a restraining order is not clear and convincing evidence of a substantial danger that mother would violate a stay-away order if one were requested by the Agency and ordered by the juvenile court. Judged in light of this entire record, at most it is evidence mother herself lacked the ability, emotional resolve, and/or initiative to seek out and apply for a restraining order against her brother and/or nephew on her own. Simply put, her lack of initiative to *procure* a restraining order is not clear and convincing evidence of her unwillingness or incapacity to *abide* by one.

other than to keep D.L. away from the male relatives who had abused her. It is difficult to envision what more "engagement" could reasonably be expected of her. As the social worker herself acknowledged, safety planning is a collaborative effort, yet here it appears the Agency largely abdicated its role in that process.

In these circumstances, there is not clear and convincing evidence to support removal of D.L. from mother's custody. (See, e.g., *In re L.G., supra,* 118 Cal.App.5th at p. 1232 [reversing order removing child for lack of such proof where agency "presented no evidence that it had explored interventions to mitigate remaining sources of risk and determined they were infeasible," including by following up with relative who indicated willingness to assist or by exploring family maintenance plan involving counseling, in-home services, parenting supports, and regular check-ins from a social worker]; *In re Ashly F.* (2014) 225 Cal.App.4th 803, 810 [reversing disposition order where father had completed parenting class and agency failed to consider whether there were reasonable means of protecting children, including unannounced visits, public health nursing services, in-home counseling services and removing mother from home].) Indeed, the juvenile court granted discretion for mother to have unsupervised visits, which further undermines its findings by clear and convincing evidence that nothing short of removing D.L. from mother's custody could keep her safe. (See *In re M.V., supra,* 78 Cal.App.5th at pp. 962-963 [noting that juvenile court's granting of discretion to allow unsupervised visits "buttress[ed]" other evidence it was safe to return children to parental custody].)

We are not persuaded by any of the Agency's arguments to the contrary. Although the Agency acknowledges the clear and convincing evidence standard applies in the juvenile court, it does not acknowledge that

this heightened standard continues to apply on appeal under the substantial evidence standard, it mistakenly argues we need only review the court's findings for substantial evidence, and none of its arguments are tailored to this higher standard of proof. So, on its face, the Agency's entire argument is unpersuasive. (See *Symons Emergency Specialties v. City of Riverside* (2024) 99 Cal.App.5th 583, 597 [appellate argument " 'lacks legal force' " when party " 'fails to apply the appropriate standard of review' "]; accord, *Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948 [" ' "Arguments should be tailored according to the applicable standard of appellate review." [Citation.] Failure to acknowledge the proper scope of review is a concession of a lack of merit' "].)

The Agency's position largely boils down to stressing the abuse to which D.L. had been subjected, and the fact that this was not the first time the Agency had intervened—circumstances that are relevant and appropriately considered by the juvenile court. But we cannot just stop there. As we have noted, the record shows mother acted entirely appropriately and protectively in response to the Agency's prior intervention concerning a different perpetrator which, if anything, suggested she could be trusted to do the same in response to the Agency's safety concerns about the current ones. Further, the Agency places far too much emphasis on the fact that mother failed to protect D.L. from sexual abuse from two more live-in relatives. That circumstance is indeed troubling and is the reason the court assumed jurisdiction. (And, as noted, mother has never challenged the Agency's decision to intervene.) By itself, though, it is not *clear and convincing evidence* of current danger if D.L. were allowed to live with mother in mother's new home, and that no reasonable means existed to protect her short of removing her from mother's custody. Jurisdictional findings alone

20

"do not constitute prima facie evidence that [a child] cannot safely remain in the home." (*In re Zoe H.* (2024) 104 Cal.App.5th 58, 74.) " 'The law requires that a child remain in parental custody pending the resolution of dependency proceedings, *despite the problems that led the court to take jurisdiction over the child*, unless the court is clearly convinced that such a disposition would harm the child.' " (*In re M.V.*, *supra*, 78 Cal.App.5th at p. 967.) The Agency does not meaningfully grapple with that principle.

Nor do any of the other isolated bits of evidence the Agency mentions add up to clear and convincing evidence on this record of danger that could not be ameliorated by lesser protective measures: a single inconsistent statement mother made about when she first learned of D.L.'s accusations concerning her uncle H.L.M; the fact that years earlier, she had discussed D.L.'s accusations about A.L.M. with D.L. while in his presence—evidence that at most reflects past insensitivity and/or naivete about how to handle such matters, not current unwillingness to take appropriate protective measures with the support and supervision of the Agency and the juvenile court; and the fact that her new rented room was only 1.4 miles away from her prior home—a fact the juvenile court said was irrelevant ("The focus about the distance is not one that I'm particularly convinced about one way or the other"). Nor was the fact that mother didn't initially believe D.L. when the new allegations came to light particularly probative of the risks that existed by the time of the disposition hearing, particularly in light of everything else we have discussed. As noted, the investigating detective didn't believe D.L. either. Further, any initial doubts mother might have harbored did not prevent her from subsequently taking all necessary steps to protect D.L.—including instructing D.L. to immediately call police if anything ever happened again and finding a new place to live. Those are not the

21

actions of a mother who is substantially likely to bury her head in the sand to the dangers posed by her brother and nephew.

In the end, the picture that emerges from this record is of a parent with limited means and limited English language skills who fully cooperated with child protective services and protected her daughter once the gravity of the situation became apparent to her—despite that it meant severing ties with yet more family members. Like many parents who come to the attention of child protective services, mother was not sophisticated enough to devise a safety plan on her own, and she understandably struggled somewhat in conversations on that topic. But the Agency did little if anything to proactively assist her with safety planning, and there is no evidence it ever suggested a single potentially feasible, concrete idea for mother to consider. It also ignored the fact that mother had already once complied with a safety plan that kept her daughter safe from a sexual perpetrator—a fact that should have counseled in her favor. The Agency acknowledges mother and D.L. "shared a strong bond." Her daughter missed her, was struggling emotionally, and wanted to come home. The juvenile court erred when it concluded there was clear and convincing evidence that doing so would be dangerous and there were no reasonable means of keeping D.L. safe other than requiring D.L. to endure further time in an out-of-home placement.

## DISPOSITION

The disposition order as it relates to mother is reversed.

STEWART, P. J.


We concur.


RICHMAN, J.


DESAUTELS, J.


*In re D.L.* (A174221)